Abraham M. KATZ, Defendant, Appellant,

v.

UNITED STATES of America, Appellee.

Harry A. KATZ, Defendant, Appellant,

v.

UNITED STATES of America, Appellee.

Samuel KATZ, Defendant, Appellant,

v.

UNITED STATES of America, Appellee.

Max KATZ, Defendant, Appellant,

v.

UNITED STATES of America, Appellee.

Nos. 6082–6085.

United States Court of Appeals First Circuit.

July 12, 1963.

Certiorari Denied Nov. 12, 1963. See 84 S.Ct. 193.

Manuel Katz, Boston, Mass., with whom Paul T. Smith, Boston, Mass., was on brief, for appellants.

Paul J. Redmond, Asst. U. S. Atty., with whom W. Arthur Garrity, Jr., U. S. Atty., and Daniel B. Bickford, William F. Looney, Jr., and John J. Curtin, Jr., Asst. U. S. Attys., were on brief, for appellee.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

ALDRICH, Circuit Judge.

■■ These are appeals by four defendants, convicted at a joint trial on a total of twelve counts for attempting to evade income taxes by filing false and fraudulent personal returns for one or more of the years 1955 to 1958. The defendants, three brothers and a brother-in-law, were the officers, directors and stockholders of State Line Potato Chip Company, Inc. Defendant Max Katz, the principal and managing officer of the company, will hereinafter be referred to as Max, and the rest, collectively, as the other defendants. The other defendants sought trial separately from Max, alleging that their cases were essentially different, and, further, that they would be prejudiced by certain extrajudicial admissions allegedly made by Max and concededly not binding upon them. On the government's representation that "basically the evidence would be the same" against all four (it did not deny individual differences, or that Max had made personal admissions) the court refused to sever. It added, "[I]f at the end I find there has been prejudice, I won't hesitate to act." Thereafter the court did, in fact, act. Initially there had been included four counts against Max for causing falsification of the corporate returns. After the trial began, apparently feeling that in that matter the basic evidence was different, with Max's permission the court granted a mistrial on those counts and postponed them to a later date. It took no subsequent action with respect to separating the other counts, nor was it asked to. The mere fact that all the evidence is not admissible against all defendants does not necessitate separate trials. Opper v. United States, 1954, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101; Malatkofski v. United States, 1 Cir., 1950, 179 F.2d 905. Having read the full record we are well satisfied that it was appropriate to try the remaining cases together.

■■ The defendants moved to quash the indictment, and to strike the petit jury panel, because of the manner of drawing the grand and petit juries. One of their grounds we have since disposed of in Gorin v. United States, 1 Cir., 1963, 313 F.2d 641, cert. den. 374 U.S. 829, 83 S.Ct. 1870, 10 L.Ed.2d 1052. The other is an alleged discrimination in that no jurors were drawn from that part of

the district which lies west of Worcester County. 28 U.S.C.A. § 1865(a) provides,

"(a) Grand and petit jurors shall from time to time be selected from such parts of the district as the court directs so as to be most favorable to an impartial trial, and not to incur unnecessary expense or unduly burden the citizens of any part of the district with jury service. To this end the court may direct the maintenance of separate jury boxes for some or all of the places for holding court in the district and may appoint a jury commissioner for each such place."

The clerk stated in open court that when the court was sitting in Boston it was standard procedure not to call jurors from west of Worcester County. We take judicial notice that this has been so for many years. In the light of this statute there can certainly be no abuse in not calling jurors who live over 60 miles from the courthouse. The defendants' point is groundless. United States v. Gottfried, 2 Cir., 1948, 165 F.2d 360, cert. den., 333 U.S. 860, 68 S.Ct. 738, 92 L.Ed. 1139.[1]

■ Prior to trial the defendants moved for the suppression of a certain "black book" and the "fruits thereof."[2] The court properly found, on adequate testimony, that this book was a corporate record, and had been taken by the government after it had been tendered to the agent by Max (albeit that Max misrepresented its content, causing the tender to be initially refused) and that no constitutional rights had been infringed. The point pressed on this appeal, except for arguments based upon testimony properly discredited by the district court, is that subsequently, at the trial, the revenue agent testified that he had not stated his exact purpose when asking for the book. We will assume, without deciding, that this testimony may be related back to the motion. Even so, the present contention is both late and specious. It is too late because even when the motion was reargued to the district court the point was not made. It is specious because even if it be assumed that to request a document by stating that it is wanted for one reason when another reason is the one primarily in mind may be a misrepresentation, there is no evidence that Max was misled. Analysis, not necessary to articulate, indicates that he could not have been.

Coming to the merits, there are only two substantial questions;[3] the court's permitting the jury to find that certain corporate distributions constituted income wilfully concealed by individual defendants, and the marking of the corporate books as exhibits. These questions require a brief summary of the evidence.

■ On the testimony of Max and the two other defendants who took the stand, which we may largely accept in this

---

1. One matter perhaps necessary to mention is the trial court's observation, when the clerk stated that for Boston sittings jurors were never drawn from west of Worcester County, that it was " * * * a lucky thing I am not a witness in this case. I know better." Defendants seek to make something of this. We have currently inspected a number of jury requisitions in the files of the district court signed by this judge, including the requisition preceding the drawing of this particular petit jury, and they all, in accordance with the regular practice, provide for calling "persons residing in cities and towns in Worcester County and Counties to the east thereof * * *" and none other. The court's contrary "knowledge" can only be regarded as a hasty remark, quite out of keeping, it may be added, with its meticulous conduct of the trial.

2. This book did not go to the jury, and the only suggested "fruit" was an extrajudicial admission by Max, when confronted by the book, that he had falsified certain other records. Since this admission was not permitted to be considered against the other defendants, strictly Max alone is presently interested in this question.

3. Several small matters are raised which do not warrant discussion. The defendants press two evidentiary exceptions with respect to which, if there were error, the issues were so minuscule that there could be no possible prejudice. De-

particular, the general management and all of the fiscal affairs, including making all the entries in the books of the company were, with the acquiescence of the other defendants, handled by Max alone. The other defendants took no action in their several capacities of officers and directors, attended no meetings, and signed "minutes" and other papers without reading. Max's authority extended even to a single-handed "big-brother" decision as to all corporate distributions to all defendants, whether by way of salary, bonus, or otherwise.

The evidence warranted a finding that payments pursuant to Max's determination were made continually, not only by the common device of having the company satisfy personal bills, in some instances under the guise of having them appear to be corporate expenses, but also by deposits into over two hundred savings bank accounts, and into a war savings bond account from which bonds were bought which were subsequently redeemed by individual defendants. Many of these savings accounts were in joint names, to include a child of the defendant, but in most instances the children testified that they had no knowledge that the accounts existed. This warranted an inference that the individual defendants retained full ownership, and that not merely the deposits, but accrued interest, constituted personal income. Testimony was introduced, also, as to the payment of bills and the purchase of property, tangible and intangible, for defendants' children. On the government's evidence the resulting direct and attributable income greatly exceeded that stated on the returns.

A primary defense of the other defendants to this showing was that they were unaware that Max had made many of these distributions. In support thereof Max testified that he did not disclose the bank accounts to the others and that he made the deposits, and various other

payments, surreptitiously for his own private purposes, planning their subsequent recapture; in short, that this was a concealed embezzlement. The jury could find it inherently improbable that if Max intended these to be secret, improper transfers of corporate assets against the interest of his brothers he would have made them in this elaborate manner in which his brothers and their children were so frequently given at least record title or control. In addition, there was testimony of a handwriting expert warranting the jury in finding that the other defendants had substantial notice, and in many instances specific knowledge from Max that this distribution procedure was in process. The defense presented, at best, an issue of fact which the court fully put to the jury.

The government's first witness testified that all defendants executed their returns in blank, and that the witness, as the accountant, thereafter prepared the returns of all four on the basis of information given him by Max, and filed them without further verification. Two of the other defendants acknowledged this, but testified that they supplied Max with personal data. However, they admitted that with respect to the substantial matter of corporate distributions and withholding they never knew the correct amounts and relied upon Max to ascertain them as well as to inform the accountant. A return is not short of wilful falsity because the taxpayer chooses to keep himself uninformed as to the full extent that it is insufficient, or as to what exact figures should have been inserted. Innocence can not outdistance ignorance. The jury was warranted in finding that all defendants knew Max was not revealing their full income. This was enough.

The other principal issue relates to the admission of the corporate records. Although it was open to the jury to find

fendants also complain of the court's alleged refusal to grant four requests for instructions. To the extent these instructions were not clearly given in sub-

stance, in some instances repetitiously by explicit qualifying instructions when the evidence referred to was introduced, the requests were erroneous.

that the records were authentic, United States v. Tellier, 2 Cir., 1958, 255 F.2d 441, cert. den., 358 U.S. 821, 79 S.Ct. 33, 3 L.Ed.2d 62, the government made no attempt to prove that they were made in the regular course of business, and hence admissible under 28 U.S.C.A. § 1732.[4] We may agree with the defendants, other than Max who prepared and was personally responsible for them and cannot make the point, that corporate records not so kept are normally inadmissible against officers and directors who are not shown to have been responsible for them, or to have had actual knowledge of their content, in cases involving personal (as distinguished from corporate, cf. Cooper v. United States, 8 Cir., 1925, 9 F.2d 216) matters. Worden v. United States, 6 Cir., 1913, 204 F. 1; Osborne v. United States, 9 Cir., 1927, 17 F.2d 246, cert. den. 274 U.S. 751, 47 S.Ct. 765, 71 L.Ed. 1332. But cf. United States v. Tellier, supra. The court admitted the records generally, but charged the jury that they should be considered against a particular defendant only if it found that they had been kept in the regular course of business and that the defendant had had opportunity of access thereto. This was a peculiar ruling, not only because if the records had been made in the regular course of business they would appear admissible under Section 1732 even if the defendant did not have access, but, more important, because it was never shown, and seemingly never even claimed, that they were so kept. The jury was not instructed as to the meaning of "kept in the regular course of business," and must have assumed that the evidence warranted such a finding. Since it did not, this condition could not be effective, and whatever the jury did because of it can be of no legal consequence.

We must accordingly interpret the court's instruction as merely requiring the jury to find that the records were accessible. Under the unusual circumstances of this case, however, we think this was a sufficient limitation. Where the defendants were all the officers, directors and stockholders of the company, the singular, absolute authority delegated to Max by the others to manage all their affairs could not fail to make him their agent with respect to keeping the corporate books, at least to the extent that the books were open to their inspection. Cf. United States v. Feinberg, 2 Cir., 1944, 140 F.2d 592, 154 A.L.R. 272, cert. den., 322 U.S. 726, 64 S.Ct. 943, 88 L.Ed. 1562. Any other result would put a premium on the defendants' voluntary anopsia.

One final matter. The other defendants contend that a substantial number of payments attributed to them by the government were shown (conclusively, they say, and for present purposes we will so assume) to have been beneficially received by Max, instead, or to have represented repayments of amounts loaned to the corporation on open account. These defendants claim the totals are so large that, with the possible exception of one or two counts as to one of them, they did not in fact underpay their taxes, and that, accordingly, their motions for acquittal should have been granted. Examination of the evidence as a whole, however, discloses that in order for each defendant to have overpaid his tax certain additional items of income must be eliminated as to which, once the corporate records are admitted, there was a clear issue of fact.[5] This, of course, was enough; the extent of the underpayment was not vital. United States v. Johnson, 1943, 319 U.S. 503, 517, 63 S.Ct. 1233, 87 L.Ed. 1546. There was no error in denying the motions.

Judgment will be entered affirming the judgments of the District Court.

4. Indeed, in a brief distinguished by its brevity, the government has, except as to Max, failed to offer any authority or reason why the records should have been admitted at all.

5. As to one defendant the issue was over what inferences should be drawn as to certain checks.