Harry SAGANSKY, Defendant, Appellant,

v.

UNITED STATES of America, Appellee.

Morris WEINSTEIN, Defendant, Appellant,

v.

UNITED STATES of America, Appellee.

Nos. 6608, 6609.

United States Court of Appeals First Circuit.

Heard Dec. 7, 1965.

Decided March 25, 1966.

Walter J. Hurley, Boston, Mass., with whom Thomas E. Dwyer, Boston, Mass., was on brief, for appellant in No. 6608.

Francis J. DiMento, Boston, Mass., with whom DiMento & Sullivan, Boston, Mass., was on brief, for appellant in No. 6609.

William J. Koen, Asst. U. S. Atty., with whom W. Arthur Garrity, Jr., U. S. Atty., was on brief, for appellee.

Before ALDRICH, Chief Judge, and McENTEE and COFFIN, Circuit Judges.

McENTEE, Circuit Judge.

These appeals are from judgments of conviction entered on jury verdicts finding the defendants Sagansky and Weinstein guilty of knowingly using wire

communication facilities for the transmission of wagers in interstate commerce in violation of 18 U.S.C. § 1084 (a).[1] The indictment is in five counts. The first four charge the defendants jointly with the commission of this offense on four separate occasions in February 1964.[2] The fifth count charges Sagansky alone with violation of this statute on January 23, 1964.

There appears to be no dispute as to the material facts. There is substantial evidence that the defendants were engaged in the business of betting and wagering. On December 30, 1963, John Hanley, a special agent in the Intelligence Division of the Treasury Department, was introduced to Sagansky by one Cecil Rhodes, Jr., who had been placing bets with Sagansky. He introduced Hanley as Gerry Connelly, a business man from Washington, D. C. On that date after Hanley indicated he was interested in placing bets, Sagansky gave him his telephone number and also gave him two other numbers to call when Sagansky was not available. On January 22, 1964, Hanley went to Sagansky's apartment in Brookline, Massachusetts, to collect on a recent bet he had made with him. While there Hanley placed another wager with Sagansky who informed him he would be leaving for Florida in a few days and told Hanley to be sure to use the two telephone numbers he had previously given him. He also stated he had talked to "Moe" and "Bernie" and they would handle his "action" while he (Sagansky) was out of town.

As Hanley was leaving the apartment he told Sagansky he would be in Washington the next day and would call and give Sagansky some action. To this Sagansky replied "Sure, that's okay." On the next day, January 23, Hanley made a call from Washington to Sagansky in Brookline and placed a bet which Sagansky readily accepted.[3] Hanley returned to Boston the following day and went to Sagansky's apartment to collect on a previous bet. After paying Hanley $6200 Sagansky again told him that "Moe" and "Bernie" had been spoken to and they would handle his action in Sagansky's absence. During this conversation he asked Hanley where he had called from the day before. When Hanley told him he had called from his office in Washington, Sagansky said "That's what I thought * * *" and requested Hanley to be more careful and to use a public telephone in the future.

On January 30 while Sagansky was in Florida, Hanley called the defendant, Morris Weinstein, also known as "Moe." He identified himself as "Gerry" explaining that "Doc [Sagansky] was supposed to have contacted you about me." Weinstein replied "Oh Gerry, Hello. How are you?" In this conversation Weinstein assured Hanley he would handle his action. During the next week Hanley made a number of local telephone calls to Weinstein placing bets and met with him on one occasion to make payment for his losses.

On February 10 while in Washington, Hanley made a long distance call to

---

1. § 1084. Transmission of wagering information; penalties

"(a) Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers, shall

be fined not more than $10,000 or imprisoned not more than two years, or both."

2. February 10, 12, 19 and 21, 1964.

3. The substance of this telephone conversation was as follows. Hanley stated, "I have another one for you today. Golden Grain, $500 to win." Sagansky replied, "Okay, that's $500 to win on Golden Grain, right?" Hanley said, "Right." Sagansky then asked Hanley when he would be returning to Boston so he could have the money ready for him which he (Hanley) had won on a previous bet.

Weinstein from a pay station and placed a bet which Weinstein readily accepted.[4] On February 12 Hanley again called Weinstein from the same public phone booth in Washington and placed a horse wager which Weinstein repeated and Hanley confirmed. During this conversation Weinstein also acknowledged receipt of a check to pay for his losses which Hanley had mailed him from Washington. On February 18 Hanley called Weinstein person-to-person from Washington and overheard him tell the operator that Weinstein was not there. On the next day Hanley placed another call to Weinstein from Washington, this time station-to-station. After acknowledging that Hanley had called him the day before, Weinstein requested Hanley not to call him person-to-person, stating that he [Weinstein] had to be more careful. Hanley then placed a bet on a horse which Weinstein erroneously repeated and Hanley corrected.

On February 21 while still in Washington Hanley called Sagansky at his Brookline apartment and when he attempted to place a wager, Sagansky told him "to call the other fellow" (meaning "Moe"). Hanley informed Sagansky he was calling from Washington. Within a half hour Hanley called Weinstein as Sagansky had suggested. When he told Weinstein he had just talked to "Doc," Weinstein replied "Yeah, I know." Hanley then placed a bet which Weinstein readily accepted. On February 25 Hanley settled his account with Sagansky at his Brookline apartment.

■ Before the trial began each defendant moved to dismiss the indictment on the ground that the grand jury had been improperly selected. It appears from the stipulation filed in connection with these motions that the jury commissioners drew the prospective jurors from voting lists. The defendants contend that this method of selection is unlawful because it automatically excludes citizens who are not registered to vote. It also appears that no jurors were drawn from that part of the District of Massachusetts west of Worcester County which defendants claim is discriminatory. We have already decided that these grounds are insufficient to warrant dismissal of an indictment. Katz v. United States, 321 F.2d 7, 8 (1st Cir. 1963), cert. denied, 375 U.S. 903, 84 S.Ct. 193, 11 L. Ed.2d 144; Gorin v. United States, 313 F.2d 641, 644 (1st Cir. 1963), cert. denied, 374 U.S. 829, 83 S.Ct. 1870, 10 L.Ed.2d 1052; see also King v. United States, 346 F.2d 123 (1st Cir. 1965).

■ Defendants also filed pretrial motions for severance on the ground that each of them is prejudiced by the joinder of the other for trial together. They allege that it may be an integral part of the defense proffered by one defendant to call his co-defendant as a witness in his behalf and that said witness is not or may not be available to the other defendant unless each defendant is tried separately. They also argue that the offenses are not so simple in character that the acts charged against each defendant could be readily segregated and fairly understood by the jury. Clearly, joinder of the defendants in this indictment was proper under Rule 8(b) of the Federal Rules of Criminal Procedure, 18 U.S.C. Defendants attempt to bring this case within the purview of Criminal Rule 14 entitled "Relief from Prejudicial Joinder." As we said in Gorin v. United States, supra, to obtain severance defendants must make a strong showing of prejudice in order to invoke the discretionary remedies provided in this rule. It is well settled that the

---

4. There was no direct testimony that Weinstein definitely knew that Hanley was calling from Washington, but there was sufficient evidence from which the jury could find that Weinstein knew that it was a long distance call from another state. According to Hanley's testimony, when Weinstein answered, the operator asked Hanley to deposit $1.85. After depositing quarters, dimes and nickels, Hanley commented that it sounded like the 4th of July. Weinstein replied, "Yes, it does." Hanley also told Weinstein he was calling from a pay station because Doc (Sagansky) had told him to do so when calling from out of town.

granting of severance lies in the discretion of the trial judge. Stilson v. United States, 250 U.S. 583, 585, 40 S.Ct. 28, 63 L.Ed. 1154 (1919). The denial of motions for severance on the same grounds as urged here were found by this court not to constitute an abuse of discretion. Gorin v. United States, supra, 313 F.2d at 645-646.

■ We now come to the questions raised by the defendants during the trial itself. The court admitted evidence against both defendants of a certain telephone conversation between Weinstein and Treasury Agent Hanley and shortly thereafter admitted evidence against both defendants of a certain telephone conversation between Hanley and Sagansky. This evidence was admitted over objection of the defendants who complain they were prejudiced by the trial court's refusal to limit the conversation between Hanley and each defendant to the case against that defendant. On several other occasions during the trial the court so limited the admissibility of similar conversations as requested by counsel. It should be noted, however, that at the time the court refused to so limit these two telephone conversations, there was already ample evidence in the record from which the jury could find that when they took place these defendants were engaged in the joint commission of an offense. The record also shows that just prior to the admission of this evidence the court instructed the jury on the subject of joint commission of offenses.

As we said in Quercia v. United States, 70 F.2d 997, 999 (1st Cir. 1934):

"* * * where there is prior evidence of an agreement to commit, or the joint commission of an offense, the statement of one is evidence against all who are concerned in it, if made in furtherance of the common design. It is not necessary that the indictment be for conspiracy, if a joint enterprise is shown and they are indicted as codefendants."

Therefore, we cannot say that the trial court committed prejudicial error in refusing to so limit the two conversations above mentioned as requested by the defendants. See also Lee Dip v. United States, 92 F.2d 802 (9th Cir. 1937).

■ One of the essential elements of proof of the crime charged is the use of a wire communication facility for the transmission of bets or wagers. Defendants contend that the evidence is insufficient to warrant a finding that they used a wire for transmission of a wager in violation of 18 U.S.C. § 1084(a).[5] The gist of this contention is that the offense is committed by the one who initially sends in the bet and not by the one who receives it; in other words, the meaning of "transmission" as used in this statute does not embrace the act of receiving. While this might be a proper construction of the term "transmission" taken out of context, § 1084(a) does not punish the mere transmission of bets or wagers, but rather the "use" of interstate wire communication facilities for their transmission. When a person holds himself out as being willing to make bets or wagers over interstate telephone facilities, and does in fact accept offers of bets or wagers over the telephone as part of his business, we think it is consistent with both the language and the purpose of the statute to hold that he has "used" the facility for the transmission of bets or wagers. Cf. United States v. Fassoulis, 185 F.Supp. 138, 139 (S.D. N.Y.1960), affirmed, 2 Cir., 293 F.2d 243, cert. denied, 368 U.S. 919, 82 S.Ct. 240, 7 L.Ed.2d 134 (1961).

■ Next, defendants point to the fact that the statute refers to "bets or wagers" in the plural, and assert that the transmission of one isolated bet is not enough. We agree that if this be true, the fact that there were five counts, each for a different occasion, would not help the government. Each count must speak for itself. Walker v. United States, 176 F.2d 796 (9th Cir. 1949).

5. Defendants also contend that the court's charge on the definition of "transmission" was erroneous.

However, even though it is perhaps plausible on its face, we reject defendants' construction. It is evident that section 1084(a) is not designed to reach persons who bet or wager on only one, passing, occasion. To this end, a prerequisite to violation of the statute is that a defendant be "engaged in the business of betting or wagering." [6] The statute does not, in terms, create a further prerequisite that a defendant be in the interstate, as distinguished from intrastate, business. The only reasonable explanation for the defendants' proposed interpretation is that, by employing the plural number, Congress did just that. This would certainly be an awkward way to do it, and the legislative history [7] suggests no such purpose. Indeed, what little assistance we get from the legislative history only reenforces our belief that use of the plural number was the result, not of design, but of somewhat imprecise, conversational, language; and that Congress in fact wished to reach a single use of interstate facilities by one otherwise engaged in the business of betting.[8]

Furthermore, defendants' construction would lead to totally impractical results. Suppose a professional gambler used interstate wires on ten different days, but never to place more than one bet on a single day. Would he have never violated the statute? If he would have violated it, when, and how often, i. e., how many counts should there be in the indictment? Complicated questions of double jeopardy can be readily imagined. We cannot believe that Congress intended an interpretation which would produce such difficulties.

■■ Within limits the intention of Congress may prevail over the literal language of the statute. Idaho Sheet Metal Works, Inc. v. Wirtz, 86 S.Ct. 737, 2/24/66. We reject defendants' construction of the statute. In this particular case we believe that such a construction would make the statute so vague as to render it unconstitutional. If a defendant is professionally engaged in making bets and wagers, one single use of interstate facilities is an offense.

■ Another assignment of error urged here relates to the so-called "piecemeal" instructions given by the court at various intervals during the trial.[9] We have examined these instructions with care and we cannot say that any of them constituted prejudicial error. It appears to us that for the most part these instructions were necessary under the circumstances in order to clarify the issues and generally to assist the jury.

■ The defendants make objections to the charge to the jury, raising again the whole subject of entrapment, on which, of late, we have frequently

---

6. That defendants were in the business was adequately alleged in each count, and established.

7. See: U.S. Code Cong. & Ad. News, Vol. 2, p. 2631 (87th Congress, First Session, 1961).

8. "Subsection (a) of the new section prohibits those persons who are engaged in the business of betting or wagering from knowingly using *a wire communication* facility for the transmission of *bets or wagers* in interstate or foreign commerce on any sporting event or contest. It also prohibits the transmission of *a wire communication* which entitled the recipient to receive money or credit as a result of a *bet or wager* or for information assisting in the placing of *bets or wagers*." House Report No. 967, 87th Cong., 1st Sess. (1961) (Ital. suppl.) Although subsection (a) uses the plural number each of the four times it refers to bets or wagers, the quoted portion of the Report employs the singular and plural indiscriminately.

9. On at least four occasions the court instructed the jury that questions put by counsel to a witness were not to be considered as evidence. The court also instructed the jury on the matter of joint commission of a crime and alerted the jury with reference to the defense of entrapment.

commented. At the expense of repetition, but because there appears to be much misunderstanding, the defense of entrapment is afforded not because the defendant did not commit the offense, but because it is not proper that he should be convicted for government-produced criminality. On the other hand, the mere fact that the opportunity to commit the offense was afforded to a man waiting for such an opportunity does not mean that the government was the effective cause of his criminal conduct. The question is, who generated it? Thus, in every case of entrapment there are two possible issues. (1) Did the government put in motion this particular offense; and (2) did it initiate the defendant's criminal state of mind, or only activate it? The first issue is called inducement; the second is considered in terms of defendant's predisposition.[10] In Gorin v. United States, supra, we held that the defendant has the burden of proving by a preponderance of the evidence that he was induced and if he meets this burden, the prosecution must then prove beyond a reasonable doubt that defendant was predisposed to commit the offense.

■ In the instant case most of the evidence came from the government. The defendants sought to elicit the fact of entrapment from the government witnesses. It is undisputed that the government agent, Hanley, was the one to suggest the use of the interstate wire for his proposed bets. The defendants accordingly requested the court to charge that inducement had been established as a matter of law. The court refused, and left the issue to the jury, placing the burden upon the defendants. This was error since the court thereby placed a burden on the defendants to prove something which the government had already proved for them. Agent Hanley's conduct here amounted to inducement as a matter of law.

We might agree that where there is an open, unmistakable offer, as by a vendor displaying an article on his counter, the act of a government agent in making a purchase could not in any reasonable sense be regarded as inducing the crime. But here the fact that the defendants were, we will assume, self-advertised as engaged in accepting bets did not constitute an open offer to commit the much more serious offense of transmitting across state lines. As to this, the initiation clearly came from Hanley. It is true that defendants readily accepted. We unhesitatingly reject their contention that entrapment was shown as matter of law. However, we do not see how it could be said that Hanley did not induce the offense. See Waker v. United States, 344 F.2d 795, 796 (1st Cir. 1965); Whiting v. United States, supra note 8, 321 F.2d at 75.

■ Since this case must be retried in any event, this is a suitable occasion to consider whether we should revise our rule as announced in Gorin v. United States, supra. We there affirmed the action of the district court in placing the burden of persuasion upon the defendant to establish inducement, but remanded for a new trial because the court had failed to charge the jury that the *quantum* of this burden was only a preponderance of the evidence. We know of no court that has ever placed a heavier burden on the defendant, and under no circumstances would we consider doing so. However, since our decision in *Gorin,* we have noticed and commented upon the confusion apt to be generated in a jury's mind by having to apply two measures of the burden of proof in the same case. See Waker v. United States, supra, 344

10. A third question, to which we addressed ourselves, in Whiting v. United States, 321 F.2d 72 (1st Cir. 1963), cert. denied, 375 U.S. 884, 84 S.Ct. 158, 11 L.Ed.2d 114, and will not dwell upon further, is whether, even if a defendant may be criminally predisposed, the government must have known this before offering him the opportunity.

F.2d at 796, n. 3. Upon further consideration, we think that this difficulty calls for resolution. The solution that we propose is to reduce the burden which we have previously placed on the defendant from a burden of persuasion to a mere burden of coming forward with evidence.[11] Johnson v. United States, 115 U.S.App.D.C. 63, 317 F.2d 127, 129 n. 2 (1963); United States v. Silva, 180 F. Supp. 557, 558 (S.D.N.Y.1959).[12] This we do, not because our view of the doctrine of entrapment has changed, but in order to simplify the problems of the jury and, possibly, of the charging judge.

 Accordingly, if the evidence, whether elicited from the government or defense witnesses, would warrant a finding of inducement, the defendant is entitled to a charge that the government has the burden of proving beyond a reasonable doubt either that there was in fact no inducement, or that the defendant was predisposed, as we have previously defined predisposition. The evidence of inducement, or, conceivably, of the absence of predisposition, may be so strong that either or both questions must be resolved in the defendant's favor as matter of law. Conversely, of course, if the defendant fails to meet his burden of coming forward with evidence of inducement, there is no entrapment as a matter of law, and, thus, nothing on that matter to go to the jury. If, as in the present case, there was inducement as a matter of law, then only the question of predisposition is submitted to the jury and the government has the burden of proving it beyond a reasonable doubt.

Judgments will be entered vacating and setting aside the judgments of the district court and remanding the cases for a new trial.

---

11. For a discussion of the difference, see McCormick, Evidence §§ 306 and 307 (1954).

12. We make no comment on whether we would agree with the courts' appraisals of the evidence in these cases.