**The UNITED STATES of America**

**v.**

**Carmello MERLINO, Stephen Rossetti, David Turner, and William Merlino.**

**No. Crim. 99–10098–RGS.**

United States District Court, D. Massachusetts.

March 7, 2002.

Robert E. Richardson, United States Attorney's Office, Boston, MA, for Plaintiff.

Martin Boudreau, Milton, MA, Robert A. George, Robert A. George, PC, William J. Cintolo, Cosgrove Eisenberg & Kelly, Robert M. Goldstein, Peter Parker, Boston, MA, for Defendants.

*MEMORANDUM AND ORDER ON DEFENDANTS' MOTIONS FOR JUDGMENTS OF ACQUITTAL OR IN THE ALTERNATIVE FOR A NEW TRIAL*

STEARNS, District Judge.

After an extended trial, defendants were convicted of conspiracy and attempt to violate the Hobbs Act, 18 U.S.C. § 1951, and of two counts of carrying or possessing a firearm during and in relation to a crime of violence, 18 U.S.C. § 924(c).[1] Defendants

---

1. Defendants David Turner and Stephen Rossetti were also each convicted of two counts of being felons in possession of an explosive

singularly and collectively have filed motions for judgments of acquittal pursuant to Fed.R.Crim.P. 29, or in the alternative, for a new trial pursuant to Fed.R.Crim.P. 33. The legal standards to be applied are well-rehearsed. In acting on a motion for judgment of acquittal, "the trial judge must resolve all evidentiary conflicts and credibility questions in the prosecution's favor; and, moreover, as among competing inferences, two or more of which are plausible, the judge must choose the inference that best fits the prosecution's theory of guilt." *United States v. Olbres*, 61 F.3d 967, 970 (1st Cir.1995). "The remedy of a new trial is rarely used; it is warranted 'only where there would be a miscarriage of justice' or 'where the evidence preponderates heavily against the verdict.'" *United States v. Andrade*, 94 F.3d 9, 14 (1st Cir.1996). Because I find no merit to the motions, they will be summarily denied, with the exception of one aspect of the motion for judgment of acquittal filed by defendant William Merlino, which warrants more extended consideration.

*Motion for Judgment of Acquittal on Counts Three and Four*

 Counts Three and Four of the Indictment charged all defendants with carrying or possessing firearms during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c).[2] In challenging their convictions on these two counts, defendants argue that a conspiracy to violate 18 U.S.C. § 1951, colloquially known as the Hobbs Act, is not a crime of violence. More specifically, defendants maintain that because federal agents knew through an informant (Anthony Romano) of the defendants' plans to execute the robbery, "there

was never any risk of physical force being used in either the planning or commission of a fictional event." Defendants concede, as they must, that the cases uniformly hold that a Hobbs Act conspiracy constitutes a "crime of violence" because the crime by its very definition, "involves a substantial risk that physical force may be used against the person or property of another." *United States v. Elder*, 88 F.3d 127, 129 (2d Cir.1996). *See also United States v. Taylor*, 176 F.3d.331, 337–338 (6th Cir. 1999). Defendants' claim of legal impossibility based on the certainty of their planned robbery being thwarted by law enforcement has also been rejected in every context in which it has been raised. *See, e.g., United States v. Phan*, 121 F.3d 149, 153 (4th Cir.1997); *United States v. Yang*, 281 F.3d 534, 544 (6th Cir.2002).

*Motion for Judgment of Acquittal on Count Two*

Count Two of the Indictment charged all defendants with an unsuccessful attempt to violate the Hobbs Act. An attempt under federal law is informed by the common law principle that mere preparation does not ordinarily suffice to make out an attempt. "But some preparations may amount to an attempt. If the preparation comes very near to the accomplishment of the act, the intent to complete it renders the crime so probable that the act will be a [crime], although there is still a locus poenitentiae, in the need of a further exertion of the will to complete the crime." *Commonwealth v. Peaslee*, 177 Mass. 267, 272, 59 N.E. 55 (1901) (Holmes, C.J.).

---

device and firearms in violation of 18 U.S.C. § 922(g)(1).

**2.** The counts differed only in the firearms specified. Count Three charged the defendants with the possession and carrying of an

explosive grenade. Count Four charged the possession and carrying of five pistols and a rifle. It is Count Three that raises a troubling issue with respect to defendant William Merlino.

■ Defendants argue evidentiary insufficiency, based on an alleged failure of the government to show the taking of a "substantial step" towards the commission of the offense. A substantial step consists of conduct that is "strongly corroborative" of the firmness of a defendant's criminal intent. *United States v. Mandujano*, 499 F.2d 370, 376 (5th Cir.1974). In this regard, defendants argue that there is no evidence that they "ever c[a]me within *miles* of the Loomis facility" on the appointed day. The argument focuses on defendants' lack of geographical proximity to the intended target to the exclusion of the preparatory acts relied upon by the government to establish the defendants' intent: that defendants "cased" the Loomis facility; prepared a "stolen" van; acquired cell telephones and police scanners; gathered an arsenal of weapons, masks, and bulletproof vests; met on the penultimate day to finalize plans for the robbery; and were either at or driving towards the assembly point with the tools of the trade when they were arrested. While cases like *United States v. Buffington*, 815 F.2d 1292, 1302 (9th Cir.1987), have emphasized physical proximity to the target of the robbery as a critical corroborating element, this case is closer in its facts to *United States v. Chapdelaine*, 989 F.2d 28, 33 (1st Cir.1993), and *United States v. Del Carmen Ramirez*, 823 F.2d 1, 2 (1st Cir. 1987), where convictions for attempted robbery were upheld on less evidence of confirmatory preparation than was shown here.[3]

*Motion for Judgment of Acquittal on Counts One and Two*

■ This motion is directed to the sufficiency of the government's evidence regarding the interstate commerce element of the Hobbs Act, and to the constitutionality of the Hobbs Act itself. The first contention is a variant of defendants' legal impossibility argument. In essence, defendants maintain that because the success of the robbery was not viable (because of the government's pre-existing knowledge of the plot), it follows that no potential to affect interstate commerce existed. The argument misapprehends the proper test to be applied, which measures the impact on interstate commerce that would have occurred had the conspirators succeeded in their crime. *See United States v. Jannotti*, 673 F.2d 578, 591 (3d Cir.1982); *United States v. Nguyen*, 246 F.3d 52, 54 (1st Cir.2001). A successful robbery of an armored car depository storing some seventy million dollars in cash could hardly be said to have had but a slight impact on interstate commerce, much less no impact.

Defendants' second argument is more difficult to grasp, but I understand it to say that the Supreme Court's decisions in *United States v. Morrison*, 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000) and *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (holding respectively that the federal civil remedy for ender-motivated crimes of violence provided by the Violence Against Women Act and the gun possession proscriptions of the Gun–Free School Zones Act are unconstitutional for want of a sufficient showing of a nexus to interstate commerce), have either undermined the constitutionality of the Hobbs Act or the reasoning of cases like *Jannotti* that have upheld inchoate Hobbs Act convictions despite the absence of a showing of a substantial impact on interstate commerce. The short answer to this argument is that it has been rejected

---

**3.** There is, of course, nothing to the defendants' argument if proximity is measured from the assembly point at TRC Autoelectric in Dorchester rather than from the ultimate target, the Loomis facility in Easton.

by every Circuit Court of Appeals that has considered it. *See United States v. Gray*, 260 F.3d 1267, 1272–1274 (11th Cir.2001); *United States v. Peterson*, 236 F.3d 848, 852 (7th Cir.2001); *United States v. Malone*, 222 F.3d 1286, 1294–1295 (10th Cir. 2000). *Cf. United States v. Cardoza*, 129 F.3d 6, 11 (1st Cir.1997). I see no reason to recite the distinctions drawn by these cases with *Morrison* and *Lopez* other than to note their emphasis on the difference between noneconomic crimes like domestic violence and gun possession, whose impact on interstate commerce is indirect at best, and robbery, which is an economic crime with a direct effect on interstate commerce.

### Turner's Motion for Judgment of Acquittal on Grounds of Entrapment

■ Defendant Turner argues that the he was entrapped as a matter of law. Whether such a thing as entrapment as a matter of law exists in the real world is open to some doubt. The defense of entrapment rests ultimately on a defendant's predisposition (or lack thereof), which is a quintessential issue of fact. *See United States v. Coady*, 809 F.2d 119, 122 (1st Cir.1987). (One might imagine a case, as the Ninth Circuit did in *Poehlman, infra*, in which no facts regarding inducement or predisposition are in dispute, although one would think that any resulting error would have more to do with the judge's instructions than with the jury's verdict). Turner cites a 1966 First Circuit case that states in *dicta* that entrapment may be found as a matter of law, *see Sagansky v. United States*, 358 F.2d 195, 203 (1st Cir.1966), a thought more recently articulated by the Ninth Circuit in *United States v. Poehlman*, 217 F.3d 692, 698 (9th Cir.2000). Assuming that a judge in an appropriate case could find the government's evidence so unbelievable as to warrant the entry of a verdict for a defendant as a matter of law, this is not that case. Turner's ardent embrace of the plot, his contribution of the cellular telephone to facilitate communications with the "insider," his role in transporting the firearms on the morning of the planned heist, his own admission on tape that he had prior experience with armored car robberies, and his prior firearms convictions were more than sufficient to validate the verdict.

### Motion for a New Trial

■ Defendants Turner and Rossetti object to the fact that statements of Carmello Merlino, surreptitiously recorded by Romano prior to the alleged advent of the conspiracy, vouching for defendants' status as "veterans" and recounting his and Turner's earlier surveillance of the Loomis facility, were admitted "to inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between the participants in the crime developed." *United States v. Williams*, 205 F.3d 23, 33–34 (2d Cir.2000). That the statements were admissible against Carmello Merlino under Fed.R.Evid. *801(d)(2)(A)* as admissions of a party-opponent is not contested. In its instructions to the jury, the court accordingly stated that while the statements were admissible for substantive purposes against Merlino "you may only consider these statements against other defendants from the point at which you find that at least one other defendant associated himself with the criminal plan so as to make the conspiracy complete."[4] Not

---

4. The court also explained that Romano, as a cooperating informant, could not be counted as a conspirator for this purpose. The court offered to give a limiting instruction at the time Merlino's statements were admitted.

only were the statements properly admitted for the reasons stated by the court (the *Williams* rationale), the jury could have found, based on Merlino's statements alone, that he and Turner had begun to conspire to rob the Loomis facility prior to any discussion of the subject with Romano. *See Bourjaily v. United States*, 483 U.S. 171, 181, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). Moreover, even if the statements were improperly admitted, they were merely cumulative of nearly identical statements made by Merlino on or after January 14, 1999, the date on which all parties agree the conspiracy was in full bloom.[5]

■■■ Defendant Turner next objects to the court's refusal to permit the elicitation on cross-examination from Special Agent Nadolski the fact that conviction on the grenade possession count carried with it a mandatory minimum sentence of thirty years. As I understand the argument, Nadolski is alleged to have implanted the idea of the conspirators arming themselves with grenades to enhance the government's leverage over Turner as a means of extracting whatever knowledge he had regarding the Gardner Museum art theft. The theory is often referred to as sentencing manipulation, defined as the offer of an inducement to a willing defendant to commit a more serious crime (or series of crimes) solely as a means of ratcheting up his sentence. *See United States v. Jones*, 18 F.3d 1145, 1152–1154 (4th Cir.1994). The theory (and its close cousin, sentenc-

ing entrapment) has been almost uniformly rejected by those courts that have considered it. *See, e.g., United States v. Montoya*, 62 F.3d 1,4 (1st Cir.1995); *United States v. Garcia*, 79 F.3d 74, 76 (7th Cir. 1996). While the theory is more plausible restated as a claim of outrageous government misconduct, *see United States v. Lacey*, 86 F.3d 956, 963 (10th Cir.1996), this too, is a much · disfavored doctrine, *see United States v. Miller*, 891 F.2d 1265, 1271 (7th Cir.1989) (Easterbrook, J., concurring), and in any event an issue for the trial judge, not the jury. *United States v. Johnson*, 565 F.2d 179, 182 (1st Cir.1977). In sum, Turner's claim trenches on the established rule that punishment is the exclusive concern of the court and is not to enter into any facet of the jury's deliberations. Federal Judicial Center, *Pattern Criminal Jury Instruction* 4 (1988). *See also United States v. Thomas*, 895 F.2d 1198, 1200 (8th Cir.1990). And finally, it founders on the absence of any evidence suggesting such a purpose on Nadolski's part. To the contrary, the idea of procuring grenades for the robbery was first brought up by Carmello Merlino in a conversation recorded by Romano on December 3, 1998.

■■■ The next argument, that the events of September 11 created an atmosphere unduly prejudicial to the defendants' right to a fair trial deserves little by way of response. Defendants were not charged with terrorism, but with common garden-variety crimes, distinctive only for

---

Defendants requested that a limiting instruction not then be given.

**5.** On January 14, 1999, Merlino, referring to Turner and Rossetti, stated "You know, they got theirs [firearms] already. Things they used before." In the same conversation, Merlino told Romano: "He's [Turner] been out there before.... I mean before we even brought this up.... I went out there with

Dave.... To see the fucking place." These subsequent statements also dispose of Turner's claim that the government used the earlier statements as substantive proof of Turner's disposition in closing argument. As the government points out, and as the passages cited by Turner confirm, the government was careful to limit its argument in this regard to Merlino's post-January 14 declarations.

their audacity, and not for any resemblance to the heinous acts of the terrorists who plotted the attacks against the World Trade Center and Washington, D.C. To the extent that prospective jurors had qualms about serving on a jury or sitting in a federal building in the aftermath of 9–11, the court asked those jurors to come forward and excused all who did.[6] The argument that public discussion in the wake of 9–11 about the need for the United States to cultivate human intelligence as a means of thwarting future terrorist attacks overly-legitimized Romano's role as a government informant is too convoluted to bear scrutiny.

Both Turner and Rossetti argue that they were prejudiced by the court's refusal to sever their cases for separate trials. Turner's contention is that the evidence "joined him at the hip" with the ostensibly more unsavory Carmello Merlino and Rossetti. For his part, Rossetti argues that "[t]he mere fact that Turner was sitting at the table with [him] severely limited [his] ability to fully explore on cross-examination the idea that Turner brought the guns and hand grenade in the duffle bag in his [Turner's] car—the Tahoe—and that he [Turner] moved the bag into [Rossetti's] Honda." Rossetti characterizes this thought as a lost opportunity to present an "antagonistic defense."[7]

■■■■ "In the context of conspiracy, severance will rarely, if ever, be required." *United States v. Searing*, 984 F.2d 960, 965 (8th Cir.1993). *United States v. Brandon*, 17 F.3d 409, 440 (1st Cir.1994) (same). That virtually dispositive principle aside, Turner's "spillover" argument fails because of the fact that the "spillover" evidence about which he complains would have been independently admissible at a separate trial. *See United States v. Levy–Cordero*, 67 F.3d 1002, 1008 (1st Cir.1995) ("As we have previously explained, [w]here evidence featuring one defendant is independently admissible against a codefendant, the latter can not convincingly complain of an improper spillover effect"). Rossetti's argument fails on the rule that antagonistic defenses do not establish a *per se* right to a severance. *Zafiro v. United States*, 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). "[T]he antagonism in defenses must be such that if the jury believes one defense, it is compelled to convict the other defendant." *United States v. Angiulo*, 897 F.2d 1169, 1195 (1st Cir.1990). In the first instance, it is doubtful that Rossetti's purported defense is an antagonistic defense at all. The most that Rossetti claims is that he was a smaller fish than Turner because he had a lesser role in trucking the guns to the robbery. *See United States v. O'Bryant*, 998 F.2d 21, 26 (1st Cir.1993). The evidence clearly indicated that Rossetti had prior knowledge that guns and grenades would be used in the robbery, and that he and Turner were responsible for their production. Under the government's aiding and abetting theory, it mattered not a whit whether the guns were brought to the scene in Rossetti's Honda or Turner's Tahoe.

■■■ Rossetti next argues that a new trial should be granted because recorded telephone calls between Romano and Nadolski, under subpoena by the defense, had been inexplainably destroyed by the Bureau of Prisons (BOP). While Rossetti concedes that "there was much evidence

---

**6.** Rossetti's argument that the court "should have inquired further into the jury's feelings about September 11th" is belied by the record. The inquiry was more than thorough.

**7.** As the government observes, Rossetti did not make this argument prior to trial. He merely joined in Turner's "spillover" motion.

[that] the Defendants were able to use against Romano on cross-examination," he contends that these tapes would have been "invaluable," although he does not specify how. In addressing this issue prior to trial, the court indicated that it was disturbed by the BOP's destruction of the tapes and that it was willing to so instruct the jury. While defendants brought out the fact that the tapes had been destroyed during the cross-examination of Romano, no request for the invited instruction was made, nor despite the fact that the defendants were provided with written copies of the proposed charge, no objection was made to the omission of the instruction. Any claim of error was therefore waived.

Rossetti also claims prejudice from the government's unsuccessful attempt to play an enhanced portion of a January 28, 1999 recording in which Rossetti allegedly tells Carmello Merlino and David Turner that he had obtained the desired hand grenades for use during the robbery. As Rossetti correctly observes, the enhancement had never been disclosed to the defense. When the court learned of the non-disclosure, it preemptively continued the matter for three days to permit counsel to review the tape. When the court reconvened, it struck the enhanced tape as an exhibit. Consequently, the tape was never played for the jury.[8]

*William Merlino's Motion for Judgment of Acquittal on Count Three*

■ This motion raises a troubling issue. The only evidence that William Mer-

lino was aware that hand grenades would be used in the commission of the robbery came from Romano's testimony about the January 28, 1999 planning meeting. To place the testimony in context, it is important to understand some aspects of William Merlino's background. William Merlino is Carmello Merlino's nephew. He is a recovering heroin addict with a record of petty crimes, mostly involving theft, that are consistent with the profile of an inveterate drug user. Unlike the other defendants, William Merlino had no involvement in the hardened crimes of his uncle's usual criminal associates. By all accounts, he was deeply affected by the recent death of his wife and was peculiarly susceptible to the influence of his domineering uncle. His role in the conspiracy was essentially that of a gopher. Indeed, on the night of the critical meeting, William Merlino was sent out from time to time to collect accessories (hockey bags and masks) to be used in the robbery.

The critical testimony consists of the following exchange between Romano and the Assistant United States Attorney regarding the conspirators' meeting on the night before the robbery.

Q. During that discussion [of the final plan], were there any periods of time when any of those four individuals left the room?

A. We were separated in the building for a while.

---

**8.** Rossetti's claim that Nadolski was nonetheless permitted to testify to the contents of the enhanced tape is a misstatement. Nadolski rather was permitted to testify to his debriefing of Romano after the January 28 meeting. In the debriefing, Romano reported the discussion of hand grenades. The statement was properly admitted pursuant to Fed.R.Evid. 801(d)(1)(B). Rossetti also assigns error to the government's failure to produce an allegedly exculpatory air surveillance photograph, which he claims would have contradicted an agent pilot's airborne observations of Turner and Rossetti moving multiple bags from the Honda to the Tahoe. As the government points out, the allegedly exculpatory photograph is of another location. Moreover, Rossetti never brought to the court's attention the late disclosure of the photograph. Nor did he ask to recall the agent to be examined with respect to the photograph, a request which, had it been made, would have been granted.

Q. Was that before or after the discussion about the final plan?

A. Both times.

Q. During the time—at the end when you were discussing the weapons, the equipment, the plan in terms of where people were going to go when, were there any periods of time when any of the four people left the group?

A. I don't recall. I think we split up a couple of times.

Q. During the discussion of the plan when Stephen Rossetti told the group that he had guns and grenades, who else was present in the room at that time?

A. Everybody was there.

As William Merlino's counsel succinctly states: "Three decades in jail ride on those three words." It is, of course, a long-standing rule that a conviction can rest on the uncorroborated word of an informant witness, so long as the jury is fully apprized of any agreements that he has reached with the government, and so long as the court gives "complete and correct instructions detailing the special care the jury should take in assessing the testimony of the [informant]." *United States v. Ortiz-Arrigoitia*, 996 F.2d 436, 438–439 (1st Cir.1993). All of that was done here, and in a purely legal sense, the verdict is unimpeachable. I have no particular reason to believe that Romano's testimony did not reflect his best efforts to accurately

remember who was present when the critical words were spoken by Rossetti, nor do I doubt the credibility of his testimony on other important aspects of the case. Nonetheless, given Romano's admitted lapses of memory, and the lack of any contemporary documentation or other corroborating evidence of his testimony on this point,[9] I am left with the nagging conviction that the unadorned statement "Everybody was there" is too slender a reed to support the mandatory thirty year consecutive sentence that the law otherwise requires as an addition to the substantial punishment that William Merlino will almost certainly receive.[10]

### *ORDER*

For the foregoing reasons, the motions for judgments of acquittal on behalf of Carmello Merlino, David Turner, and Stephen Rossetti are *DENIED*. The motion of William Merlino for judgment of acquittal is *DENIED* except as to Count Three of the Indictment as to which the motion is *ALLOWED*. The motions of all defendants for a new trial are *DENIED*. The Clerk will schedule sentencing hearings separately for each defendant.

· SO ORDERED.

---

9. Romano made contemporary notes of this meeting as he did others. These do not specifically indicate William Merlino's presence during this conversation, although they do not exclude the possibility. The government to its credit conceded at the hearing on the motions that there is no other evidence than Romano's account of the meeting that suggests that William Merlino knew or should have known that grenades would be used in the robbery.

10. I do not credit William Merlino's argument that there was insufficient evidence to support the government's argument that he was not entrapped into participating in the conspiracy. His predisposition was proved by his unrelenting acquiescence to his uncle's bidding and his enthusiastic embrace of the conspiracy's ultimate goal.