UNITED STATES of America

v.

**Robert BABORIAN and Anthony Lauro.**

**C.R. No. 80–0018.**

United States District Court,
D. Rhode Island.

Nov. 25, 1981.

---

**326**

James Leavey, Sp. Atty., U.S. Dept. of Justice, Providence, R.I., for plaintiff.

John Tramonti, Jr., Providence, R.I., for Baborian.

Ralph Gonnella, Providence, R.I., for Lauro.

## OPINION

PETTINE, Chief Judge.

The defendants are accused of violating 18 U.S.C. §§ 2 and 1084.[1] Though a jury was impanelled, it was subsequently excused, and the case was tried to the Court by agreement of the parties.

The major question presented is whether or not the activities of the defendant Baborian constituted the "business of betting or wagering." 18 U.S.C. § 1084(a) reads as follows:

> (a) Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers, shall be fined not more than $10,000 or imprisoned not more than two years, or both.

The evidence in the case consisted of bookmaking records seized from defendant Anthony Lauro's apartment in Rhode Island, and intercepted telephone conversations between these defendants and others. Baborian is a lavish gambler; since at least the first week of March 1977 through December 1977 he wagered, with Lauro alone, an average of $800 to $1,000 a day, three to four times per week, on professional baseball, basketball, and football. In addition to betting, the intercepted phone conversations reveal that he received the line[2] on games, made up his own line, and gave Lauro his opinion on the best games on which to wager.

In all, there were eight telephone conversations. Since they are the basis of the indictment, the substance of each conversation is set forth. The government accurately summarizes them in its memorandum as follows:

> On December 9, 1977 at 6:58 p. m., Baborian placed six bets for a total of $800. He received the line on professional basketball, had already made up his own line, and gave Anthony Lauro his opinion on the best games to wager on.

> On the following day at 11:13 a. m., he opened and closed a teaser,[3] mentioned that he was in a rush, asked for the afternoon games, asked Lauro if he had gotten him "three with Cincinnati," gave his opinion to Lauro on the best games to bet and asked what time Lauro would get the line on the college games.

> On December 11, 1977 at 11:50 a. m., Baborian told Falk that he played the whole card, that is, 23 games.

---

1. These defendants were charged in one count of a multicount indictment. This case was severed.

2. The "line" is simply the points added to an underdog, or subtracted from the favorite, to balance more evenly the teams for wagering purposes.

3. A "teaser" is a single wager on two or more teams, all of which must win in order to collect. The bettor receives a more favorable point-spread than under the actual line, but collects a lesser payoff if he wins.

On the same day at 1:45 p. m., Baborian asked Falk to get him a line on a professional basketball game. [Falk is a defendant in other counts of the indictment.]

On December 12, 1977 at 6:35 p. m., Robert Baborian mentioned his own line, received the college line from Lauro, made four bets for a total of $600 and asked for the football line.

On December 17, 1977 at 6:20 p. m., Baborian placed 12 bets with Lauro for a total of $1,700.

On December 14, 1977 at 5:55 p. m., Robert Baborian called his father [in Rhode Island] from New York City. The conversation shows that Baborian came out of a Christmas party to get the line from his father and to place wagers... Baborian asked his father to relay the wagers to Anthony Lauro. The wagers totaled $800.

On December 16, 1977, there were a series of phone calls from Robert Baborian in Connecticut to [his father] in Providence who in turn relayed wagers to Anthony Lauro. At 6:15 p. m., Robert Baborian called his father, received the line from him and asked his father to place five bets for Baborian with Anthony Lauro. These wagers totaled $1,550.... [T]his call was placed from Fairfield, Connecticut. Twenty minutes later, [his father] relayed these wagers to Anthony Lauro and told Lauro that [his son] called him from New Haven and that "He's driving in." Fifteen minutes later, Robert Baborian again called his father, stated that he had just talked to "Pooch," made a mistake on one of his wagers and wanted to raise a $100 bet to $250. At 6:55 p. m., [the father] called Lauro and after Lauro confirmed that he had just spoken to Robert Baborian, [the father] relayed the wager made from Connecticut by [his son] to Anthony Lauro.... [T]his second call from Robert Baborian to [his father] was made from Milford, Connecticut.

The government concedes that Baborian only placed bets with Lauro and did so only for himself. It further concedes that all these calls, except those of December 14 and 16, were intrastate. The only other evidence presented was the records seized from Lauro's apartment which show that he was servicing a number of customers in addition to Baborian.

### *"Business" of Betting or Wagering—Defendant Baborian*

█ The *sine-qua non* of conviction under this statute is proof that the defendant was in the "business" of betting or wagering. When such a business exists is not easy to determine. There are no sharp contours in a general term such as "business," and the present state of the law is indeed amorphous.

The legislative history does not help solve the problem at hand. I do not believe the legislators were thinking of a situation such as exists in this case when they enacted section 1084. They used words interchangeably, thus obfuscating the meaning of their various statements. Referring to "professional" gamblers, the legislative history of the Act contains the following observation:

> Law enforcement is *not interested in the casual dissemination of information with respect to football, baseball, or other sporting events between acquaintances. That is not the purpose of this legislation. However, it would not make sense for* Congress to pass this bill and permit the *professional gambler to frustrate any prosecution by saying, as one of the largest layoff bettors* in the country has said, "I just like to bet. I just make social wagers." This man, incidentally, makes *a profit* in excess of a half-million dollars a year *from layoff betting.* Therefore, there is a broad prohibition in the bill against the use of wire communications for gambling purposes.

S.Rep.No.588, 87th Cong., 1st Sess. (1961) (emphasis added).

█ It is not too difficult to say from this legislative history that the bill does not encompass discussions between friends as to their opinions on the outcome of sporting

events. On the other hand, one cannot say with certainty what was intended by the term "professional gambler." However, "professional gambler" was used in connection with layoff betting, which has a clear meaning in the gambling world—it is nothing more than the process whereby a gambler accepts bets from bettors and then in turn places a portion of these bets with another gambler to balance his books. In other words, he bets with another gambler to minimize potential losses.[4] Whatever meaning the Congress had in mind, it certainly did not appear to include a mere bettor.

Other legislative history likewise is of little help. For example, when section 1084 was proposed, Senator Kefauver asked during the hearings, "What are you going to do about *private* social betting . . . [,] any individual *at home* calling up to see how *a* horse race went.[?]" It was then suggested that the proposed bill be amended to have it apply to gambling activities in furtherance of a business enterprise. From this it may be argued that the Senator intended that a mere social bettor not be included within the provisions of the bill. The reader, however, can only wonder at what the Senator would have said if he were asked to define "social" betting.

Representative Celler said, "This bill only gets after the *bookmaker*, the *gambler who makes it his business to take bets or to lay off* bets." From this statement one could conclude that Representative Celler intended to cover only the typical bookmaker. However, he qualified his statement by adding, "It does not go after the casual gambler who bets $2 on a race. *That type* of transaction is not within the purvue of the statute." 107 Cong.Rec. 16,534 (1961) (emphasis added). What would Representative Celler have said of one who gambled approximately $200,000 a year with one other gambler?

Further review of the legislative history casts no clearer light on the meaning of "engaged in the business of betting or wagering." The House Report on the bill reads:

> Testimony before your Committee on the Judiciary revealed that modern *bookmaking* depends in large measure on the rapid transmission of gambling information by wire communication facilities. For example, at present the immediate receipt of information as to results of a horse race permits a bettor to place a wager on a successive race. Likewise, *bookmakers* are dependent upon telephone service for the placing of bets and for layoff betting on all sporting events.
>
> The availability of wire communications facilities affords opportunity for the making of bets or wagers and the exchange of related information almost to the very minute that a sporting event begins.
>
> H.R.Rep.No.967, 87th Cong., 1st Sess. (1961), *reprinted in* [1961] U.S.Code Cong. & Ad.News 2631, 2631–32, (emphasis added).

■■ This last quote does indicate that the business of gambling is a bookmaking operation entailing the acceptance of bets and laying off of bets. I conclude, after considering all of the foregoing legislative history, that Congress intended the business of gambling to mean bookmaking, *i.e.,* the taking and laying off of bets, and not mere betting. The provocative question is whether this is still the proper definition when the bettor wagers substantial sums and displays the sophistication of an expert in his knowledge of odds making. I conclude the statute simply does not cover such a situation. I find that Congress never intended to include a social bettor within the prohibition of the statute and that Congress did not contemplate prohibiting the

---

4. More precisely, a "lay off" is a bet placed by one bookmaker with another bookmaker in order to achieve a more favorable ratio of wagers and in order to reduce his financial risk when one bookmaker holds excess wagers on one team.

The Court notes that an additional term applicable to the business of gambling is "vigorish," the percentage a bettor must pay the bookmaker on a losing wager. The parties agreed to the incorporation and meaning of this word.

activities of mere bettors, even where, as with Mr. Baborian, they bet large sums of money with a great deal of sophistication. Indeed, I do not see how the statute could be read otherwise. The government's interpretation of the statute would make the implication of criminality turn on the expertise of the bettor and the quantum of money wagered. I submit that these factors are not determinative of what constitutes a business.

■ As I see it, the legislative language indicates that "being engaged in the business of betting or wagering" requires the sale of a product or service for a fee involving third parties, i.e., customers and clients, or the performance of "a function which is an integral part of such business." The defendant need not be exclusively engaged in such business. If he is an agent or employee of the business he need not share in the profits or losses of the business or receive compensation for his services, but "the function he performs must provide a regular and essential contribution to the [overall operation of] that business. If an individual performs only an occasional or nonessential service or is a mere bettor or customer, [regardless of the amount bet,] he cannot properly be said to engage in the business." There must be a "continuing course of conduct," and if associated with another, their joint conduct must be to achieve a common objective and purpose. *U. S. v. Scavo*, 593 F.2d 837, 842–43 (8th Cir. 1979).

The various decisions in this area are not to the contrary, but I could find no case truly on point. The government cites *Sagansky v. United States*, 358 F.2d 195, 200 (1st Cir.), *cert. denied*, 385 U.S. 816, 87 S.Ct. 36, 17 L.Ed.2d 55 (1966), for the proposition that section 1084 applies to a "bettor who is a professional gambler." This statement is circular; neither does it not tell us when a bettor is a professional gambler, nor does it define "professional gambler." Moreover, the government fails to note that, in *Sagansky*, the defendants were bookmakers, that is, they accepted bets and were clearly "engaged in the business." As the court said,

§ 1084(a) does not punish the mere transmission of bets or wagers, but rather the "use" of interstate wire communication facilities for their transmission. When a person holds himself out as being willing to make bets or wagers over interstate telephone facilities, and *does in fact accept offers of bets or wagers over the telephone as part of his business*, we think it is consistent with both the language and the purpose of the statute that he has "used" the facility for the transmission of bets or wagers. *Id.* at 200. (emphasis added).

Finally, the remainder of the opinion does not clarify the problem at stake in this case. The Court hypothesized:

Suppose a professional gambler used interstate wires on ten different days, but never to place more than one bet on a single day. Would he have never violated the statute? ... If a defendant is *professionally engaged* in *making bets* and *wagers*, one *single* use of interstate facilities is an offense. *Id.* at 201. (emphasis added).

In this last passage the meaning of the phrase "professionally engaged" is not discussed. It is not at all clear from this case whether a mere bettor is or is not excluded under section 1084(a).

Another decision in this area, *United States v. Anderson*, 542 F.2d 428 (7th Cir. 1976), describes certain betting activities as follows:

Their conversations involved in depth discussions of the merits of betting one side of a particular game or the other and the comparison of line information. Crews *placed* substantial bets with Anderson when these discussions ended. Also, Crews had on occasion used Anderson's phone to collect line information. When asked to characterize the Anderson-Crews relationship, the expert witness ... stated it was "in the nature of a partnership, a cooperating relationship where they were valuing one another's opinions and more or less working together." *Id.* at 435. (footnote omitted).

The government argued that this was enough to establish that they were partners. The court ruled to the contrary; it reversed Crews' conviction under 1084(a). It stated that, "In the instant case there was no evidence that Crews was in the 'business of betting or wagering.'" *Id.* at 436. Crews, the defendant in this case, seems to be on a comparable footing with Baborian.

In *United States v. Marder*, 474 F.2d 1192 (5th Cir. 1973), witnesses testified, *inter alia*, that they had made numerous bets and wagers with the appellant over an extended period of time. The Fifth Circuit affirmed a § 1084 conviction with language that included the following:

> There was sufficient evidence introduced by the government to prove that [appellant] committed the first element of the offense charged which forbids the use of a wire communication facility for the transmission in interstate commerce of wagering information. In addition the burden was on the government to establish that [appellant] *was in the business* of gambling or in common parlance, was a "bookie." *Id.* at 1194. (emphasis added).

Finally, in a similar manner, while addressing the meaning of the term "transmission" under § 1084(a), the Tenth Circuit noted that "the statute deals with bookmakers—'persons engaged in the business of betting or wagering.'" *United States v. Tomeo*, 459 F.2d 445, 447 (10th Cir.), *cert. denied*, 409 U.S. 914, 93 S.Ct. 232, 34 L.Ed.2d 175 (1972).

It must be acknowledged that these courts spoke in conclusory terms as to the "business" of gambling. However, the language does tend to indicate how they would address the issue in this case.

In *United States v. Scavo*, 593 F.2d 837 (8th Cir. 1979), the appellant was charged with a violation of § 1084(a). As proof that he was not in the gambling "business", he relied on cases interpreting 18 U.S.C. § 1955, which provides in pertinent part:

> (a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both.
>
> (b) As used in this section—
>
> (1) "illegal gambling business" means a gambling business which—
>
> (i) is a violation of the law of a State or political subdivision in which it is conducted;
>
> (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and
>
> (iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

The court rejected such an analogy stating:

> We find appellant's argument unpersuasive. The issue in the cases decided under § 1955 is whether the person providing line information has such a close, ongoing, and substantial relationship to the person receiving the information as to make them both participants in a single gambling business. In enacting § 1955, Congress did not intend to make all gambling businesses subject to federal prosecution; rather the statute was 'intended to reach only those persons who prey systematically upon our citizens and whose syndicated operations are so continuous and substantial as to be of national concern.'

In regard to § 1084(a), however, there is nothing to indicate that Congress intended only to punish large-scale gambling businesses. The basis of federal jurisdiction underlying § 1084(a) is the use of interstate communications facilities, which is wholly distinct from the connection between large-scale gambling businesses and the flow of commerce, which provides the jurisdictional basis for § 1955. *See United States v. Sacco*, 491 F.2d 995, 999 (9th Cir. 1974). Thus, the necessary showing of interdependence between individuals involved in an illegal gambling business under § 1955 is not required under § 1084(a). Moreover, § 1084(a) is not limited to persons who

are exclusively engaged in the business of betting or wagering and the statute does not distinguish between persons engaged in such business on their own behalf and those engaged in the business on behalf of others. *See Truchinski v. United States*, 393 F.2d 627, 630 (8th Cir.), *cert. denied*, 393 U.S. 831, 89 S.Ct. 104, 21 L.Ed.2d 103 (1968).

In *Scavo*, among the factors the court found pertinent to its conclusion that Scavo was engaged in the business of betting were the facts that Scavo furnished the bookmaker with line information on a regular basis; that such information was critical to the bookmaker's operation; and that there was a financial arrangement between the two. *Id.* at 842. Such facts are absent in the Baborian-Lauro relationship. (While Baborian discussed line information with Lauro, there was no evidence presented that showed Lauro ever relied upon Baborian to supply it.) Baborian was not a part of Lauro's business; rather, he was in the posture of a customer. Finally, I also note that the *Scavo* court, in its instructions to the jury defining the "business" of betting or wagering, pointed out that "a mere bettor or customer" cannot be said to be engaged in the business of betting or wagering. *Id.* at 842–843.

The government finds no greater support in the other cases it cites. *Katz v. United States*, 369 F.2d 130, 132 (9th Cir. 1966), *rev'd on other grounds*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), involved a defendant who placed bets on behalf of other bettors and who was a handicapper as well. *United States v. Swank*, 441 F.2d 264, 265 (9th Cir. 1971), involved a defendant who worked closely with the bookmakers in "laying off" bets to avoid an adverse effect on the horse track odds. Nothing in that opinion addresses the issue in this case.

In short, § 1084 does not sweep within its prohibition a mere bettor. Congress never intended that the federal government should thus invade the criminal jurisdiction that properly belongs to the states. I adopt defense counsels' argument that the interpretation of § 1084(a) proferred by the government

would upset this balance between state and federal law enforcement functions by drastically expanding federal criminal jurisdiction. Section 1084(a) by reaching the customer of the business would become an anomaly in the federal matrix, intruding into an area that the individual states are perfectly able to fill. As a general rule, criminal statutes must be narrowly construed. *Bell v. United States*, 349 U.S. 81 [75 S.Ct. 620, 99 L.Ed. 905] (1955); *United States v. Box*, [530 F.2d 1258, 1266 (5th Cir. 1976)]; *United States v. Bergland*, 209 F.Supp. 547 (D.Wis.1962), rev'd on other grounds, 318 F.2d 158 [159] (7th Cir.), *cert. den., sub nom, Cantrell v. United States*, 375 U.S. 861 [84 S.Ct. 129, 11 L.Ed.2d 88] (1963). This general rule applies with particular force where a broad construction would serve to push federal criminal jurisdiction into areas previously reserved to the states. Post Trial memorandum, p. 6.

■ Thus, I find that, on the record of this case, the defendant Robert Baborian was not engaged in the business of betting or wagering and, therefore, is not guilty of violating 18 U.S.C. § 1084.

*Defendant Lauro and 18 U.S.C. § 1084(a)*

There is no question that defendant Lauro accepted wagers from Baborian as a bookmaker during the period in question, and therefore was in the business of betting or wagering. The only issue as to him is whether he knowingly used or caused to be used a telephone for the transmission in interstate commerce of bets or wagers as stated in the statute. The Court need not decide whether knowledge by the defendant of the interstate nature of a betting communication is required for a conviction under § 1084(a). *See United States v. Feola*, 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975). The Court is persuaded beyond a reasonable doubt that Lauro knew that the bets he accepted from Baborian on December 16 originated from out of state.

■ A conviction of Lauro must rest on the events of December 16, 1977. An eval-

uation of the December 16th phone calls begins with a monitored call between Baborian and his father on December 14 at 5:55 p. m. In this conversation, Baborian, who was out of state, called his father in Rhode Island and asked him to place certain wagers with Lauro who was also in Rhode Island. At 6:34 p. m. of the same date, the father phoned Lauro and placed the bets. Unquestionably Lauro knew these wagers were being placed for Baborian; in the course of the conversation Lauro said "Well, I'm gonna call him back anyway. I might change. Those are the games he likes." The government argues from this last statement that it may be inferred that Lauro knew at that time that Baborian was out of state. I agree.

On December 16 the following four telephone calls were monitored. First, there was a 6:15 p. m. monitored conversation between father (Brian) and son (Baborian). There is no question that this call was placed by Baborian, who was out of state, to his father in Rhode Island. Baborian clearly told his father he was 10 or 15 minutes from New Haven, Connecticut. He asked his father to phone Lauro in Rhode Island and place certain bets.

Second, there was a 6:36 p. m. monitored conversation between father and Lauro. The father placed his son's bets with Lauro and, in the course of the conversation, told Lauro that his son had called him from New Haven. Lauro knew the bets placed were from Baborian.

Third, there was a 6:51 p. m. monitored conversation between father and son Baborian. Baborian told his father that he had just talked to Lauro (about bets) and had made a mistake. He asked his father to call Lauro back to verify his wagers.

Fourth, there was a 6:55 p. m. monitored conversation between father and Lauro. Lauro verified that Baborian had phoned him.

The 6:15 p. m. call clearly was from Baborian in Connecticut to his father in Rhode Island. The 6:36 p. m. call certainly alerted Lauro that the bets came from Baborian while he was out of state, *i.e.*, in New Haven. The 6:51 p. m. call shows that, between 6:36 p. m. and 6:51 p. m., Baborian had called Lauro to place certain wagers. At this time, Lauro knew Baborian had been in New Haven at 6:36 p. m. Thus, he certainly knew that Baborian was out of state between 6:36 and 6:51 p. m. when Baborian phoned him. The 6:51 p. m. call verifies that Baborian had phoned Lauro; in the 6:55 p. m. call Lauro acknowledges as much. The interstate nature of these calls is further established by the telephone records. (Government exhibit 6).

█ I need not dwell on whether or not the indirect relay of Baborian's out-of-state bets through his father are violative of § 1084(a), because I am convinced beyond a reasonable doubt that Lauro knew his conversation on December 16 with Baborian was interstate. In my opinion, to interpret the evidence in any other way is to strain to a fragile, meaningless filament the factual premise of this case. I take judicial notice that no one could possibly drive from New Haven, Connecticut to the Rhode Island line in the 15-minute interval between the telephone calls of 6:36 p. m. and 6:51 p. m. *See* Fed.R.Evid. 201.

I find that the government has proved Mr. Lauro's guilt beyond a reasonable doubt. It has shown that Lauro accepted wagers knowing that such wagers originated outside of Rhode Island, and that he was in the business of betting or wagering, as proven by the records seized from his apartment as well as by the intercepted phone conversations. Thus, I find the defendant Anthony Lauro guilty as charged.

So Ordered.