955 F.2d 43
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Theodore TSORAS, a/k/a Teddy, Defendant-Appellant.
 No. 91-6558.
 United States Court of Appeals, Fourth Circuit.
 Submitted Nov. 18, 1991.
Decided Feb. 21, 1992.
 
 Appeal from the United States District Court for the Northern District of West Virginia, at Elkins. Robert R. Merhige, Jr., Senior District Judge. (CR-89-235)
 Clark B. Frame, J. Michael Benninger, Wilson, Frame & Metheney, Morgantown, W.Va., for appellant.
 William A. Kolibash, United States Attorney, Paul T. Camilletti, Assistant United States Attorney, Wheeling, W.Va., for appellee.
 N.D.W.Va.
 AFFIRMED.
 Before DONALD RUSSELL, PHILLIPS and WILKINS, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 Theodore Tsoras contests the sufficiency of evidence to sustain a judgment finding him guilty of federal gambling offenses, and conspiracy to receive stolen property. Finding that the evidence was sufficient to support the verdict, we affirm.
 
 
 2
 The government's case against Tsoras stems primarily from his involvement with a gambling ring headed by Paul Hankish. Witnesses presented evidence that members of the Hankish organization contacted an out-of-state bookmaker known as "Cajun Cotton" and arranged to lay-off bets with him between 1983 and 1988 using the code number "42." "Number 42" did a high volume of business with Cajun Cotton over the telephone with bets ranging into the hundreds of thousands of dollars during peak periods. Settle-up money from Cajun Cotton was transferred via Federal Express to Tsoras at his work-place. Over the years, Hankish lined up at least one client who placed bets with Tsoras, and participated with Tsoras in various gambling activities. During the 1983-1988 period there were at least five people active with Hankish and Tsoras in the gambling operation.
 
 
 3
 Tsoras had a relationship with an out-of-state gambler named Herman Miller in which he and Miller would trade line information and move bets for each other over the telephone. He also placed bets over the telephone with an out-of-state bookie named Alfred Carbo. However, the government was unable to demonstrate that these relationships involved more than Tsoras' and Miller's personal gambling activity.
 
 
 4
 Tsoras' gambling activities led to his convictions for conducting an illegal gambling business, 18 U.S.C. § 1955 (1988); using wire communications to transmit gambling information while being "engaged in the business of betting or wagering," 18 U.S.C. § 1084 (1988); using Federal Express to receive proceeds from and to carry on the business, 18 U.S.C. § 1952(a) (1988); and being involved in a gambling conspiracy. 18 U.S.C. § 371 (1988). Tsoras' involvement in a stolen property conspiracy with Hankish also resulted in a second conviction under § 371.
 
 
 5
 To evaluate whether evidence is sufficient to support a guilty verdict, this Court considers the evidence in the light most favorable to the government, and determines whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 324 (1979).
 
 
 6
 Tsoras contends that the government failed to prove by sufficient evidence that he operated or aided and abetted the operation of an illegal gambling business in violation of 18 U.S.C. § 1955.
 
 
 7
 The pertinent part of 18 U.S.C. § 1955 reads as follows:
 
 
 8
 (a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both.
 
 
 9
 (b) As used in this section--
 
 
 10
 (1) "illegal gambling business" means a gambling business which--
 
 
 11
 ....
 
 
 12
 (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and
 
 
 13
 (iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.
 
 
 14
 18 U.S.C. § 1955 (1988). Tsoras argues that the evidence does not support a conviction for this offense because it proves only that Tsoras was a better, not a bookmaker. Moreover, Tsoras contends, the government failed to prove that he assisted five or more persons in the operation of a gambling business for a period of thirty or more days.
 
 
 15
 There is sufficient evidence to conclude beyond a reasonable doubt that Tsoras assisted the Hankish organization in laying off bets to Cajun Cotton for a period of over thirty days. An individual who regularly assists a gambling organization to lay off its bets to another bookmaker is conducting a gambling business under the statute. See United States v. George, 568 F.2d 1064, 1071 (4th Cir.1978) (when a bookmaker lays off his own bets with another bookmaker, he comes within the scope of § 1955). Moreover, under the plain terms of the statute, it is not necessary for the government to prove that Tsoras directly associated with five individuals. The government meets its evidentiary burden simply by showing that there were over five individuals involved with the gambling business, and that the business operated with at least five participants for over thirty days. See United States v. Gresko, 632 F.2d 1128, 1132-33 (4th Cir.1980). Although the government does not specify a particular thirty-day period during the five years from 1983-1988, the number of participants who had to coordinate to lay off a single bet, and the scale of the "code number 42" business supports an inference that this element was satisfied at some time.
 
 
 16
 To be found guilty of using wire communications to transmit gambling information, the government must prove that Tsoras:
 
 
 17
 [while] being engaged in the business of betting or wagering knowingly use[d] a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers.
 
 
 18
 18 U.S.C. § 1084(a) (1988).
 
 
 19
 The evidence is sufficient to establish that Tsoras was "engaged in the business of betting or wagering" in his activities with Cajun Cotton and "code number 42." Thus, Tsoras' convictions as a principal under 18 U.S.C. § 2 (1988) for causing telephone communications between the Hankish organization and Cajun Cotton in violation of § 1084 are supported by the evidence.
 
 
 20
 Tsoras contests his convictions on § 1084 counts stemming from his communications with Miller and Carbo because the phone calls were not shown to involve Tsoras' gambling "business," only his personal betting activity. He cites United States v. Baborian, 528 F.Supp. 324 (D.R.I.1981), for the proposition that the statute is not intended to punish the activities of "mere betters" even where "they bet large sums of money with a great deal of sophistication." Id. at 328-29. Yet Baborian involved an individual who was simply a customer of a bookie, unlike Tsoras, who participated in a business that facilitated the gambling of others. Id. at 331.
 
 
 21
 The government relies on United States v. Scavo, 593 F.2d 837 (8th Cir.1979), which held that § 1084 applies to persons other than those exclusively involved in the business of betting and wagering, and does not distinguish "between persons engaged in such business on their own behalf and those engaged in the business on behalf of others." Id. at 841. This case suggests two separate elements of the crime: a) participation in a betting or wagering business; and b) the use of wire communications for a purpose specifically prohibited by the statute. Id. at 840-42.
 
 
 22
 Scavo involved telephone calls that were directly pertinent to the gambling business in which the defendant was engaged. In this case, the government failed to show that Tsoras was in any way advancing the purposes of the "code number 42" business in his communications with Miller and Carbo. Nevertheless, application of Scavo is appropriate in this case. Once someone becomes engaged in the gambling business, it becomes difficult if not impossible to meaningfully distinguish the individual's "business" gambling from his or her "social" gambling. The statute is phrased in the disjunctive, and does not require the Court to draw such distinctions. Evidence of Tsoras' telephone calls to Carbo and Miller and his contemporaneous engagement in the gambling business was sufficient to sustain his convictions.
 
 
 23
 Tsoras also argues that evidence of his association with a stolen goods market operating out of a house owned by Paul Hankish is not sufficient to sustain a conspiracy conviction under the standard set out in United States v. Giunta, 925 F.2d 758, 764 (4th Cir.1991). We have carefully examined this contention and have found that the evidence is sufficient to meet the Giunta standard.
 
 
 24
 We have examined Tsoras' other contentions and find that there is sufficient evidence to conclude beyond a reasonable doubt that Tsoras carried on unlawful gambling activities using the interstate facilities of Federal Express in violation of 18 U.S.C. § 1952. We also find sufficient evidence that Tsoras was a participant in a conspiracy to conduct a gambling business in violation of 18 U.S.C. § 371. See Jackson, 443 U.S. at 319. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the Court and argument would not aid the decisional process.
 
 
 25
 AFFIRMED.