Dear Honorable Michael R. Gordon Maryland Delegate
Following the receipt of unsolicited software from Youbet.com, Inc. ("Youbet"), you requested our opinion concerning the legality of the on-line wagering services offered by that company. Youbet operates the Youbet Network, an on-line subscription service that enables a subscriber to place off-track bets through the Internet on horse races around the country through the subscriber's personal computer. You asked that we assess this system "in view of the stringent controls the legislature has placed on off-track betting in the State of Maryland."
We conclude that federal law would not bar the operation of the Youbet Network, so long as the network is operated in compliance with all applicable state laws. A Maryland criminal statute bars the placement of wagers from Maryland through the Youbet Network, as the network is currently designed. However, if that network were to employ telephone betting accounts in accordance with a regulation of the Maryland Racing Commission ("Racing Commission"), it would comply with Maryland law.
 I Background
A. The Youbet Network
Since mid-1995, Youbet.com, Inc., formerly known as You Bet International, Inc., has been engaged in developing the Youbet Network, "a secure, proprietary, closed-loop, private online network which a subscriber can access via his or her Internet service provider." Annual Report for Fiscal Year Ending December 31, 2000, Form 10-K, SEC File Number 33-13789LA ("2000 Annual Report") at p. 7.[1] While anyone with access to the Internet can view the Youbet Network "home page," one must install special software, subscribe to the network, and deposit funds into a wagering account in order to bet on horse races through this service. Youbet provides the software free of charge, which the subscriber installs on his or her personal computer in order to activate the service.[2] Id. at p. 6. In return for paying a monthly subscription fee to Youbet, the subscriber has access, via that computer and the Youbet Network, to live simulcasts of horse races at 60 tracks,[3] as well as handicapping information concerning races at those tracks and others.[4] Id. at pp. 6-10.
B. Account Wagering through the Youbet Network
To bet on horse races through a telephone wagering account, a customer opens an account with a state-licensed account wagering entity and deposits funds into the account for that purpose. The customer instructs the entity to place bets on particular races on the customer's behalf and to collect the proceeds of any successful bets. The amount in the account is adjusted as the customer wins or loses bets.
According to Youbet, it does not itself accept bets on the horse races that it simulcasts. Rather, it characterizes itself as a "facilitator" of pari-mutuel wagering[5] on horse races through telephone wagering accounts.[6] 2000 Annual Report at p. 7. In order for a Youbet subscriber to place bets through the Youbet Network, Youbet requires that the subscriber open a wagering account with a telephone account wagering system known as the Call-A-Bet System, which is operated by subsidiaries of Ladbroke Racing ("Ladbroke") that are licensed and regulated by the state of Pennsylvania.[7] See 2000 Annual Report at pp. 7, 9-10. When a subscriber places a bet on a horse race through the Youbet Network, the subscriber is sending instructions to the Call-A-Bet System. Youbet and Ladbroke split the "commissions" (net of certain fees and expenses) paid by Youbet subscribers through the Call-A-Bet System. Id. Under Pennsylvania law, Ladbroke may open a telephone wagering account for anyone located in a state where pari-mutuel wagering is authorized.[8] Thus, in conjunction with Ladbroke, Youbet offers telephone wagering accounts through its network to subscribers located throughout the United States.[9]
Subscribers to the Youbet Network can choose from horse races that are simulcast from various race tracks throughout the country. In order to place a bet, the subscriber fills out an electronic wagering ticket by making selections from various menus on the computer screen. The wager is then transmitted electronically by the Youbet Network to the Call-A-Bet System. The Call-A-Bet System accepts the bet, debits the customer's wagering account, and sends an electronic confirmation to the subscriber through the Youbet Network. According to Youbet, this entire process can take less than three seconds. 2000 Annual Report at p. 7. After the race is run, the system makes rapid additional adjustments to the customer's wagering account to reflect winnings and losses. Id.
Youbet asserts that "the convenience and immediacy [of gambling] is greatly enhanced by allowing these activities to take place in familiar locations such as the home or office as opposed to the horse track, off-track betting locations or other simulcast venues." 2000 Annual Report at p. 3. In addition, the Youbet Network offers as many as 30 live races per hour, "thus affording subscribers more opportunities than are available via other methods. Online technology also allows the execution of wagers to happen much faster than in person or over the phone. . . and wins are instantly credited to the bettor's account and available to be wagered again." Id.
C. Legal Questions Concerning the Youbet Network
The operation of the Youbet Network has raised questions concerning its legality since its inception. In October 1999, the Los Angeles Police Department executed a search warrant at Youbet's headquarters in Los Angeles. No criminal charges were filed, but the Los Angeles District Attorney's Office later brought a civil action alleging that Youbet's operations violated California gambling laws.[10] That case was ultimately settled with the entry of a stipulated judgment, including injunctive relief, without any admission of liability by Youbet. However, Youbet agreed to bar subscribers in California from placing bets through its network.[11] 2000 Annual Report at pp. 12-13, 19, F-26. More recently, the Youbet Network also has stopped accepting wagers from New Jersey residents, based on advice of the New Jersey Attorney General. 2000 Annual Report at p. 13.
In a recent prospectus, Youbet acknowledged to prospective investors that it operates in an area that may subject it to civil and criminal prosecution:
Youbet.com believes that its activities are in compliance with all applicable gaming laws and regulations as currently applied. . . . However, because there is little clear statutory and case law authority, this conclusion is not free from doubt . . . . Thus, it is possible that Youbet.com may be alleged to be in violation of an applicable statute based on an interpretation of the statute that differs from Youbet.com's. . . .Such allegations could result in either civil or criminal proceedings brought by governmental or private litigants. . . .
Amendment 1 to Form S-3 Registration Statement (July 31, 2000) at pp. 4-5.
The legality of the operation of the Youbet Network in Maryland must be assessed in light of State and federal laws governing gambling and interstate betting on horse races. We begin with federal law.
 II Federal Law
A. The Wire Act
Federal law has long prohibited interstate gambling, including the transmission of bets on horse races. See 18 U.S.C. § 1084. That statute, which was enacted in 1961 and is commonly known as "the Wire Act," makes it a crime for a person "engaged in the business of betting or wagering" to use a "wire communication facility" to transmit in interstate commerce: (1) a bet; (2) "information assisting in the placing of bets or wagers"; or (3) "a wire communication that entitles the recipient to receive money or credit as a result of bets or wagers."18 U.S.C. § 1084(a).[12] The Wire Act contains an exemption for the "transmission of information assisting in the placing of bets or wagers on a sporting event . . . from a State where betting on that sporting event is . . . legal into a State in which such betting is legal." 18 U.S.C. § 1084(b) (emphasis added). That exemption, however, does not encompass the interstate transmission of bets, as may occur in a telephone account betting system.
The prohibition in the Wire Act is necessarily qualified by another federal statute) the Interstate Horseracing Act of 1978.15 U.S.C. § 3001 et seq. From its inception, that statute has authorized interstate off-track wagers in certain circumstances and, as recently amended, explicitly includes interstate account wagering within its purview.
One of the common maxims of statutory construction is that two statutes that address the same subject are to be construed harmoniously to the extent possible. If two provisions appear to conflict, a later-enacted and more specific statute prevails. See Singer, Sutherland Statutory Construction § 51.02 at pp. 186-94 (6th ed. 2000). See also Sterling Suffolk Racecourse, Ltd. v. Burrilville Racing Association, 989 F.2d 1266, 1272-73 (1st Cir. 1993) (construing the "transmission of information" exemption in the Wire Act to be consistent with the Interstate Horseracing Act).
B. The Interstate Horseracing Act of 1978
Congress enacted the Interstate Horseracing Act ("Act") expressly "to regulate interstate commerce with respect to wagering on horseracing, in order to further the horseracing and legal off-track betting industries in the United States." 15 U.S.C. § 3001(b). While the Act does not explicitly address interstate account betting on horse races through the Internet,[13] it would appear to apply to a service such as that offered by the Youbet Network.
A basic premise of the Act is that "the States should have the primary responsibility for determining what forms of gambling may legally take place within their borders," and that the federal role is to prevent interference by one state with the gambling policies of another state. 15 U.S.C. § 3001(a)(1)-(2). To this end, the Act generally prohibits interstate off-track wagers.15 U.S.C. § 3003. However, it permits such wagers when authorized by the laws of the pertinent states, and when certain conditions are satisfied. The Interstate Horseracing Act thus "gives the States a limited power to preempt the general federal prohibition of interstate off-track wagering." Kentucky Division, Horsemen's Benevolent Protective Ass'n, Inc. v. Turfway Park Racing Ass'n, Inc., 20 F.3d 1406, 1415 (6th Cir. 1994).
First, by virtue of its definition of "interstate off-track wager," the Act permits an interstate off-track betting system to accept a wager only if the wager is "lawful in each State involved" — i.e., the state in which the race is run, the state from which the bet is placed, and the state in which the bet is received. In particular, the statute defines "interstate off-track wager" as:
[A] legal wager placed or accepted in one State with respect to the outcome of a horserace taking place in another State and includes pari-mutuel wagers, where lawful in each State involved, placed or transmitted by an individual in one State via telephone or other electronic media and accepted by an off-track betting system in the same or another State, as well as the combination of any pari-mutuel wagering pools.
15 U.S.C. § 3002(3) (emphasis added). In describing the significance of the italicized language, which was added by a recent amendment to the Act,[14] one of its congressional proponents noted that it requires that an interstate off-track wager must "meet the requirements, if any, established by the legislature or appropriate regulatory body in the state where the person originating the wager resides." 146 Cong. Rec. H11271 (October 26, 2000) (remarks of Representative Rogers). This suggests that a wager placed from Maryland through a telephone betting account is lawful under the Act only if it is, at the very least, lawful in Maryland.
In addition, the Act requires that the off-track betting system[15] obtain certain approvals. In particular, it must obtain the consent of: (1) the racing association that operates the track where the race is run; (2) the racing commission that has jurisdiction over the track where the race is run; and (3) the racing commission for the jurisdiction in which the off-track betting system is located. 15 U.S.C. § 3004(a). For the racing association's consent to be effective, the association must have a written agreement with the organization that represents a majority of the horse owners and trainers who race horses at the track where the race is run that governs the terms and conditions under which the racing association may give its consent.15 U.S.C. § 3004(a)(1). Because the authorization is conditioned on the consent of the local racing commissions in two states) i.e., the state where the race is run and the state where the bet is accepted) the interstate off-track betting system is presumably consistent with the law and policy of those states.[16]
Finally, an off-track betting office must obtain the approval of currently operating tracks within a certain proximity of the office. 15 U.S.C. § 3004(b).[17] This requirement is apparently designed to protect the interests of tracks that would be competing for the interest of the bettors.[18]
Thus, a wager placed over the Youbet Network by an individual in Maryland would have to comply with Maryland law in order to come within the authorization for interstate off-track betting, now encompassing telephone account betting, provided in the Interstate Horseracing Act. Otherwise, the system would be at odds with the congressional policy expressed in the Interstate Horseracing Act that "the Federal government should prevent interference by one State with the gambling policies of another. . . ." 15 U.S.C. § 3001(2). III
 Maryland Law
A. Criminal Prohibition Against Forwarding Wagers
Subject to a multitude of exceptions, Maryland criminal law prohibits various forms of gambling, as well as conduct that facilitates gambling. See Annotated Code of Maryland, Article 27, §§ 236-264C. In particular, it is unlawful to "forward any money, bet, wager, thing or consideration of value to be bet upon the result of any race. . ." Article 27, § 240.[19] A violation of that statute is a misdemeanor, punishable by imprisonment for a period of six months to one year and a fine in the amount of $200 to $1000. Nothing in the statute excepts a bet placed over the Internet or an on-line service.[20] Thus, the wagering services provided by the Youbet Network appear to come within the proscription of § 240, unless those services comprise one of the forms of wagering on horse races permitted by the Maryland Horse Racing Act. See Annotated Code of Maryland, Business Regulation Article ("BR"), § 11-801 et seq. The Maryland Horse Racing Act authorizes certain forms of wagering and, in effect, creates a number of exceptions to the general prohibition of gambling on horse races. First, that statute permits pari-mutuel betting at a Maryland racetrack licensed by, and operated under the jurisdiction of, the Racing Commission. Such betting may take place on: (1) live races held at that track (BR § 11-801); (2) races simulcast from another Maryland track (BR § 11-811); and (3) races simulcast from an out-of-state track (BR § 11-804).
In addition, the Maryland Horse Racing Act permits pari-mutuel betting at an authorized satellite simulcast betting facility ("SSB") on: (1) races conducted live at a Maryland track and then simulcast to the SSB; and (2) races simulcast from an out-of-state track to a Maryland track and then re-simulcast to the SSB. BR § 11-804; BR § 11-815 et seq.
Finally, the General Assembly has also authorized the Racing Commission to permit "telephone betting" at "any track where racing is authorized." BR § 11-805.
The only exception to the criminal prohibition of gambling in Maryland that would permit an individual to place a bet on a horse race without going to a licensed track or an approved SSB facility is the provision that authorizes "telephone betting" in certain circumstances. In essence, the wagering services offered through the Youbet Network are simply an enhanced form of telephone account betting. The legality of those services under Maryland law depends on whether the account wagering is conducted in compliance with Maryland's telephone betting law and the regulation adopted by the Racing Commission under that law.
B. Maryland "Telephone Betting" Law
Although the Legislature provided statutory authority for telephone account betting in Maryland during the 1980's, the regulatory framework governing such a system is of a much more recent vintage.
The genesis of the Maryland telephone betting statute was a 1982 report by a State task force. See Maryland Task Force to Study Off-Track Wagering, Interim Report (February 24, 1982) ("Task Force Report"). After surveying several alternative types of "wagering in absence [of the live race]," the Task Force recommended that enabling legislation be enacted to allow telephone wagering in Maryland.[21] Id. at p. 15. The purpose of this recommendation was "to expand racing's fan base and increase the industry's total handle without excessive new costs to the industry, while possibly resulting in new revenues to the State." Id. at p. 7.
In 1984, the General Assembly authorized the Racing Commission to "establish a system of betting by telephone on races at any track licensed [by the Racing Commission]." Chapter 753, Laws of Maryland 1984, now codified as BR § 11-805. That provision remains virtually unchanged.[22] The statute does not define "telephone betting." However, when the enabling legislation was before the Legislature, one of its sponsors testified that "telephone betting" had a variety of forms including "call-ins," cable television, or a combination of those media. Summary of Testimony at Hearing before Senate Finance Committee on February 29, 1984, Legislative File for Senate Bill 1020 (1984).
The Racing Commission did not immediately exercise the authority accorded by the telephone betting statute.[23] During the late 1990's, the possible benefits to the local horse racing industry from a system of telephone account betting in Maryland were discussed in two reports of the Commission to Study Ways to Improve the Financial Viability of the Horse Racing Industry ("the Study Commission").[24] In a 1997 report, the Study Commission surveyed various forms of "interactive wagering," which it defined as "a method of placing bets on horse races from a remote location (e.g., a home) through the use of telecommunication technology." That report concluded that interactive wagering could increase wagering pools and thus "would benefit tracks and horsemen and, indirectly, the rest of the horse racing industry in the State," but could also entail "social costs" in making gambling so readily available. Report of Commission to Study Ways to Improve the Financial Viability of Horse Racing Industry (November 1997) at pp. 41-45. A subsequent report of the Study Commission identified telephone account wagering as "the most critical source of incremental revenue" to the Maryland horse racing industry. Report of Commission to Study Ways to Improve the Financial Viability of Horse Racing Industry (March 1999) at p. 15. In that report, the Study Commission suggested that active bettors in Maryland already had telephone betting accounts in other states and strongly urged the Racing Commission to enact regulations implementing telephone account wagering. Id. at pp. 15-16.
During its next session, the Legislature adopted the sentiment of the 1999 report of the Study Commission. An uncodified section of the Racing Act of 2000 declared that "it is the intent of the General Assembly that telephone account betting as authorized under § 11-805 of the Business Regulation Article, be implemented in the State in the year 2000. . . ." Chapter 309, § 9, Laws of Maryland 2000.
In an apparent response to this legislative mandate, the Racing Commission adopted a regulation that authorizes telephone account betting and sets forth procedures for its operation. COMAR09.10.04.24.[25] Under that regulatory scheme, only a State-licensed track may apply to the Racing Commission for permission to operate a telephone account betting system in Maryland.[26] COMAR 09.10.04.24A(3), B(1). However, the track may contract with one or more entities to conduct telephone account betting on its behalf. COMAR 09.10.04.24V. Under the regulation, bets may be accepted through a telephone account betting system only on races that the track is authorized to conduct (either live or simulcast). COMAR 09.10.04.24B(3).
The regulation provides various procedures and guidelines for the creation, maintenance, and audit of wagering accounts.[27] The regulation also prescribes the allocation among the tracks and other racing industry participants of "net betting revenue" derived from telephone account betting. COMAR 09.10.04.24S-W.
The Maryland telephone betting statute clearly contemplates that telephone accounts will be established, and bets will be placed, "at any track where racing is authorized [by the Racing Commission]" — i.e., at a Maryland racetrack. The obvious purpose is to ensure that telephone account betting in Maryland takes place under the auspices of an entity regulated by the Racing Commission. Only if a betting account is established with such an entity would BR § 11-805 and COMAR 09.10.04.24 authorize the transmission of a bet by telephone.[28] Otherwise, Article 27, § 240 would apply and prohibit the transmission of a bet or funds to be bet.
As we understand it, the telephone wagering account of a Youbet subscriber located in Maryland would not be subject to regulation by the Racing Commission under Youbet's current operation. Accordingly, neither the Maryland telephone betting statute, nor the regulation adopted by the Racing Commission, would except the current incarnation of the Youbet Network from the criminal prohibition in Article 27, § 240.
 IV Conclusion
Bets made on horse races transmitted through the Youbet Network are, in reality, made through a telephone wagering account system in Pennsylvania. In our opinion, Article 27, § 240 bars the placement of wagers from Maryland through the Youbet Network, as it is currently designed. However, if that network were to employ telephone betting accounts in accordance with the regulation recently adopted by the Racing Commission, it would comply with State law. Compliance with State law is also necessary to come within the express sanction of interstate off-track betting under the federal Interstate Horseracing Act. In short, participation in the Youbet Network, or other similar systems, could be permissible, but only if the telephone account betting through the network is conducted in compliance with the Maryland telephone betting statute and regulation.
J. Joseph Curran, Jr. Attorney General
Bruce C. Spizler Assistant Attorney General
Robert N. McDonald Chief Counsel Opinions Advice
[1] Currently, the only service offered on this network involves account wagering on horse racing, which began in 1998. The company intends ultimately to offer a variety of on-line sports wagering and gaming over this network. 2000 Annual Report at pp. 2, 6. In this opinion, we address only betting on horse racing.
[2] Based on your experience, it appears that Youbet has adopted the marketing practices of other Internet companies and mailed unsolicited copies of its network software to members of the public.
[3] Youbet is able to provide the simulcasts through an agreement with certain subsidiaries of Ladbroke USA, which operates a harness track, off-track betting facilities, and a television racing network in Pennsylvania. 2000 Annual Report at pp. 9-10. The races are simulcast to the Ladbroke track in western Pennsylvania and then disseminated to Youbet subscribers via the network.
[4] Youbet purchases handicapping information under agreements with other entities. 2000 Annual Report at pp. 10, 17.
[5] Pari-mutuel wagering refers to a system of wagering on horse races in which the bettors essentially wager with each other on the outcome of the race and not against the entity conducting the race. See 18 U.S.C. § 3002(13); Annotated Code of Maryland, Business Regulation Article, § 11-101(l).
[6] Youbet itself apparently is not licensed nor otherwise authorized to accept bets or pay out winnings.
[7] Ladbroke Racing is a subsidiary of Ladbroke USA. See footnote 3, above. The entities actually licensed by Pennsylvania are two racing corporation subsidiaries of Ladbroke Racing known as Washington Trotting Association, Inc. and Mountain Laurel Racing, Inc. See Youbet Quarterly Report for the Period Ending September 30, 2000, Form 10-Q, at p. 9.
[8] Under Pennsylvania law, either the State Horse Racing Commission, which regulates thoroughbred horse racing, or the State Harness Racing Commission, which regulates harness horse racing, ("Pennsylvania Commissions") may grant permission to a "licensed racing corporation" to establish a telephone account wagering system on the condition that all "telephone messages" to make wagers are received within the race track enclosure.4 P.S. § 325.218(b). In 1987, the Pennsylvania Commissions adopted regulations that restricted telephone wagers to a toll-free line that accepted only calls originating within Pennsylvania.
See 58 Pa. Code § 169.3(a)(2) (thoroughbred);58 Pa. Code § 187.3(a)(2) (harness). Thus, at that time, telephone account wagering was only available to individuals who were physically within Pennsylvania. In late 1995, the Pennsylvania Commissions repealed these restrictions. 25 Pa. Bull. 5977, 5978. As a result, Ladbroke can offer telephone account wagering to persons outside Pennsylvania, subject to the restrictions of federal law. See Part II of this opinion.
[9] The company's website indicates that it will not accept accounts from 11 states, Puerto Rico, and the Virgin Islands. In addition, it warns that there may be restrictions on account wagering in other states. www.youbet.com, FAQ (June 12, 2001).
[10] The civil complaint alleged that Youbet was engaging in "unfair competition" and "false advertising." People v. Youbet.com, Inc., Case No. BC223065 (Cal Super.Ct.). The cause of action was premised, in part, upon Youbet's solicitation of California customers notwithstanding a California law prohibiting "betting on horse races outside an inclosure where the conduct of horse racing is licensed by the Board." See California Business and Professions Code, § 19595.
[11] Youbet also agreed to make payments to the State and various charitable organizations totaling $1.3 million and to re-locate its "wager-transmitting equipment" to another state. 2000 Annual Report at pp. 12-13, 19, F-26.
[12] The proscriptions of the Wire Act apply only to a person engaged in the "business" of betting. Sagansky v. United States,358 F.2d 195, 200 (1st Cir. 1966). An individual bettor who is not in the "business" of betting is not subject to prosecution under this section. See United States v. Baborian, 528 F. Supp. 324
(D.R.I. 1981).
[13] Legislation introduced in Congress in 1997, and again in 1999, would have directly addressed interstate account betting through a service like the Youbet Network. Those proposals would have added a new § 1085 to the federal criminal code to complement § 1084. See S.692 (106th Congress). This new provision would have banned Internet gambling, but would have also carved out an express exception for bets placed on horse races by means of a "closed-loop subscriber based service" when such wagering is lawful in the states in which the bet is initiated and in which it is received and when the recipient of the bet is subject to certain regulatory standards in the state in which it is located. That proposed legislation thus explicitly addressed some of the legal questions raised by services like the Youbet Network. However, the bill failed to pass the Congress.
[14] See Pub.L. 106-553, § 629, 114 Stat. 2762, 2762A-256.
[15] "Off-track betting system" is defined as "any group which is in the business of accepting wagers on horse races at locations other than the place where the horse race is run, which business is conducted by the State or licensed or otherwise permitted by State law." 18 U.S.C. § 3002(7).
[16] We note that, while the Act's definition of "interstate off-track wager" now contemplates the possibility of more than one off-track state (i.e., the states where a bet originates and where it is accepted), the provisions in the Act concerning approvals of the local racing commission and of tracks within a certain proximity of the off-track betting office appear to concern only one off-track state. While the Act is not entirely clear, it appears that those provisions relate to the state in which the wager is accepted — i.e., in the case of the Youbet Network, Pennsylvania.
[17] The statute provides:
(1) In addition to [approval by the host track, host racing commission, and off-track racing commission], any off-track betting office shall obtain the approval of — (A) all currently operating tracks within 60 miles of such off-track betting office; and (B) if there are no currently operating tracks within 60 miles then the closest operating track in an adjoining State.
15 U.S.C. § 3004(b)(1). This consent requirement is further qualified if the off-track betting office is located in a state with at least 250 days of "on-track parimutuel horseracing" a year. 15 U.S.C. § 3004(b)(2).
"Off track betting office" is defined as "any location within an off-track State at which off-track wagers are accepted."15 U.S.C. § 3002(8).
"Currently operating tracks" is defined as "racing associations conducting parimutuel horseracing at the same time of day (afternoon against afternoon; nighttime against nighttime) as the racing association conducting the horseracing which is the subject of the interstate off-track wager."
[18] Indeed, this provision was added to the Act in order to respond to concerns that interstate off-track betting would adversely impact smaller tracks by drawing patrons to the off-track alternative. See Dunn, Kentucky Division, Horsemen's Benevolent Protective Association, Inc. v. Turfway Park Racing Association, Inc.: Controlling the Stakes of Kentucky Horseracing, 22 N. Ky. L.Rev. 405, 409-11 (1995) (summarizing legislative history of Interstate Horseracing Act). The law does not provide, however, for any remedy to a "currently operating track" in the event its approval is not obtained. See15 U.S.C. § 3005, 3006; see also Sterling Suffolk Racing Association v. Burrilville Racing Association, 989 F.2d 1266, 1268-72 (1st Cir. 1993).
[19] Betting on horse races in Maryland was not a crime at common law. In 1890, the General Assembly enacted the predecessor of § 240, which prohibited betting on a horse race, except within the grounds of a race course. Chapter 206, Laws of Maryland 1890. In 1920, the General Assembly created the Racing Commission and authorized it to license the race courses at which different forms of legal betting on horse races could occur. Chapter 273, Laws of Maryland 1920. See generally Greenfeld v. Maryland Jockey Club, 190 Md. 96, 103-4, 57 A.2d 335 (1948).
[20] Several state attorneys general have concluded that state criminal laws concerning gambling prohibit a person from using the Internet from within a state to participate in gambling activities, even if those activities are legal in the jurisdiction in which the computer providing the service is located. See 1998 Ind. OAG No. 8, 1998 WL 391837 (even legal forms of gambling must have approval of state regulatory agency to be conducted over Internet); 80 Ops. Cal. Atty. Gen. 98,1997 WL 206243 (person may not place a bet by telephone from California even to a place where the bet would be legal); Kan. Atty. Gen. Op. No. 96-31, 1996 WL 156795 (person who gambles from computer in Kansas may be prosecuted in that state); Fla. AGO 95-70, 1995 WL 698073 (acknowledging that Internet gambling is illegal in Florida, but recommending federal resolution given nature of Internet).
[21] The Task Force Report also reviewed the experience of Connecticut with "Teletrack" (a theater in Connecticut where bets could be placed on live races run at New York racetracks) and the experience of New York and Connecticut with off-track betting parlors, commonly referred to as "OTBs." Task Force Report at pp. 9-13.
[22] The statute was recodified without substantive change as part of code revision and currently reads:
(a) . . .the Commission may authorize telephone betting at any track where racing is authorized.
BR § 11-805. See Chapter 4, § 2, Laws of Maryland 1992, Revisor's Note at p. 492.
[23] In 1987, under the authority of this statute, the Racing Commission proposed, but ultimately did not adopt, regulations that would have permitted inter-track betting. See 72 Opinions of the Attorney General 307 (1987) (concluding that statute provided authority for such regulations). The General Assembly expressly authorized inter-track betting by statute the following year. See Chapter 7, Laws of Maryland 1988, now codified as BR § 11-811.
[24] The Study Commission was originally created in 1997 as part of an uncodified portion of a bill that amended the Maryland Horse Racing Act; it was subsequently continued in existence under the authority of an executive order. Chapter 750, § 4, Laws of Maryland 1997; Executive Order 01.01. 1998.15, 25:15 Md. Reg. 1175 (June 19, 1998).
[25] The regulation was initially adopted on an emergency basis, effective September 1, 2000, and later adopted on a permanent basis, effective January 8, 2001. See 27:19 Md. Reg. 1720 (September 22, 2000); 27:26 Md. Reg. 2357 (December 29, 2000).
[26] Under the regulation, a track is accorded exclusive right to open accounts for individuals who reside within 35 miles of the track. COMAR 09.10.04.24R.
[27] To open an account, an individual must provide the track with certain basic identifying information and deposit funds into the account. COMAR 09.10.04.24D, F. A deposit into an account by means of a debit or credit card may not be used for betting purposes until noon of the following day. COMAR 09.10.04.24E. Bets and other fees are charged against the account; any winnings are credited to the account. COMAR 09.10.04.24K, L(2). The track must provide an account activity report to each account holder on a quarterly basis. COMAR 09.10.04.24M(1). An account may not be opened for anyone under the age of 18. COMAR 09.10.04.24H. Accounts may be opened for residents of other states, if permitted by federal and state law. COMAR 09.10.04.24C(2).
[28] Of course, a person located in another state would also be subject to any applicable law of that state.
 *Page 148